**AIR LINE PILOTS ASSOCIATION, IN-TERNATIONAL, Plaintiff-Appellant,**

**v.**

**TEXAS INTERNATIONAL AIRLINES, INC., New York Air Lines, Inc., and Texas Air Corp., Defendants-Appellees.**

No. 850, Docket 80–9102.

United States Court of Appeals, Second Circuit.

Argued March 23, 1981.

Decided July 29, 1981.

As Amended Aug. 24, 1981.

Michael E. Abram, New York City (Robert S. Savelson, Cohen, Weiss and Simon, New York City, of counsel), for plaintiff-appellant.

Marvin E. Frankel, New York City (Saul G. Kramer, Joseph R. Knock, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for defendants-appellees.

Before OAKES and MESKILL, Circuit Judges, and SAND, District Judge.*

MESKILL, Circuit Judge:

The plaintiff, Air Line Pilots Association, International (ALPA), appeals from a judgment dismissing its complaint for lack of subject matter jurisdiction. *Air Line Pilots Association v. Texas International Airlines,* 502 F.Supp. 423 (S.D.N.Y.1980) (Nickerson, J.). The complaint alleged various substantive violations of the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188 (1976),[1] and sought damages and injunctive relief. Judge Nickerson found that since the complaint raised a "representation dispute" under section 2 Ninth of the RLA, 45 U.S.C. § 152 Ninth, the action was not justiciable. We affirm.

## BACKGROUND

The allegations of the complaint, which must be regarded as true for the purposes of this appeal, reveal the following facts. ALPA, a widely recognized union among airline pilots,[2] is the collective bargaining representative for more than 400 pilots employed by Texas International Airlines, Inc. (TXI). Prior to February 1980, TXI was directly controlled by Jet Capital Corporation. In February 1980, a corporate restructuring took place in which a new corporation, New York Airlines, Inc. (New York Air) was formed to serve the New York-Washington, D.C. route. Under the restructuring, Jet Capital Corp. formed a holding company, Texas Air Corporation (Texas Air), of which both New York Air and TXI became wholly owned subsidiaries. New York Air then filed an application with the Civil Aeronautics Board (CAB) for a certificate of public convenience and necessity to operate air passenger service between, among other cities, New York and Washington. On December 11, 1980, the CAB approved New York Air's application, *New York Air Lines, Inc.,* CAB Order No. 80–12–57, and regular service began a week later.[3]

Upon learning of New York Air's application to the CAB, ALPA notified New York Air and TXI on September 10, 1980 of ALPA's position that "the proposed new routes, whether operated through certificates issued to Texas International or New York Air, constituted flying which must be performed by the Texas International pilots under the pilot collective bargaining agreement." (A. 9). New York Air, however, entered into individual employment contracts with the newly hired pilots and declined to recognize ALPA as their representative.

ALPA contends that the corporate restructuring which resulted in the creation of New York Air was part of a plan by TXI to defeat the existing collective bargaining relationship between ALPA and the TXI pilots. The complaint alleges that, in fact, TXI "has . . . directed and controlled New York Air through the officers, directors, management and resources of Texas International and Texas Air Corp." (A. 8). Specifically, ALPA charges that TXI has transferred to New York Air valuable landing slots at airports in New York and Washington, leased TXI aircraft to New York Air, and provided New York Air "with extensive and comprehensive management,

* Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

1. In 1936, the Railway Labor Act was made applicable to the airline industry. *See* 45 U.S.C. § 181 (1976).

2. ALPA is the collective bargaining representative under the Act for over 35,000 airline pilots employed by 30 United States air carriers. At the time the RLA was made applicable to the airline industry, *see* note 1, *supra*, ALPA was the only significant labor organization in the field. *See* Risher, *The Railway Labor Act,* 12 B.C. Indus. & Com.L.Rev. 51, 87–88 (1971).

3. This Court recently upheld the CAB order in the face of a challenge by ALPA. *Air Line Pilots Ass'n v. CAB,* 643 F.2d 935 (2d Cir. 1981).

employee, technical and financial resources, direction and control." (A. 7–8). The purpose of this corporate maneuvering, ALPA alleges, is to deprive ALPA of its representative status, to deprive the TXI pilots of their collective bargaining rights, and to frustrate the rights of TXI pilots to organize and collectively bargain.

ALPA charges that the foregoing conduct violates TXI's statutory duty (1) to "treat with" ALPA as the exclusive representative of TXI's pilots, § 2 Ninth; (2) to maintain the collective bargaining agreement, § 2 First; (3) to allow representatives to be designated without interference, influence or coercion, § 2 Third; (4) to refrain from interference in the organization of the employees, § 2 Fourth; and (5) to refrain from attempting to unilaterally change rates of pay, rules, and working conditions, § 2 Seventh, § 6. The complaint requested an order requiring TXI to deal exclusively with ALPA, to cease hiring New York Air pilots except in accordance with the ALPA agreement, to cease operating New York Air except in accordance with the ALPA agreement, and to cease its efforts to nullify the collective bargaining relationship with ALPA.

In ruling on the defendants' motion to dismiss, the district court acknowledged that in a proper case the courts may enforce a carrier's duty to bargain with a duly designated representative. Judge Nickerson found, however, that in this case there were doubts as to who was the legitimate representative of the New York Air pilots and that under § 2 Ninth the exclusive forum for the resolution of those doubts was the National Mediation Board (NMB).[4] The court emphasized that there was no allegation that "the work of the Texas International pilots is to be terminated or curtailed," 502 F.Supp. at 424, nor that the "Texas International activities are being abandoned," id. at 425. Rather, the pervasive question identified by the district court was whether New York Air and TXI should, because of their special relationship, be treated as a single carrier, even though the two airlines were "separate corporations serving different areas and flying over different routes." Id. While acknowledging that it was required to accept the truth of the allegations of the complaint, the district court pointed out that many of ALPA's conclusory allegations assumed the very question which the district court refused to decide. Having found that a representation dispute appeared on the face of the complaint, the district court concluded that it lacked subject matter jurisdiction and therefore dismissed the action. ALPA now appeals.

## DISCUSSION

This case is neither a pure representation dispute under § 2 Ninth nor a pure interference claim under § 2 Third and Fourth; rather, the problems raised here "fall[ ] between two stools." Brotherhood of Locomotive Firemen & Enginemen v. National Mediation Board, 410 F.2d 1025, 1034 (D.C. Cir.), cert. denied, 396 U.S. 878, 90 S.

4. Section 2 Ninth provides in pertinent part:

If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election.

Ct. 149, 24 L.Ed.2d 136 (1969) (Burger, J., concurring). Decisionmaking at either end of the spectrum is considerably simpler than in the hazy zone in the middle. We do not doubt, for example, that TXI itself could not commence passenger service between New York and Washington without complying with its collective bargaining agreement with ALPA. *See Virginian Railway v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) (requiring carrier to treat with the certified representative of a given craft or class of employees). Nor could TXI permissibly transfer existing business flown by ALPA pilots to a newly formed corporate alter ego for the purpose of displacing the work of ALPA pilots. *Cf. Ruby v. TACA International, Airlines, S.A.*, 439 F.2d 1359 (5th Cir. 1971) (where existing ALPA pilots were forced to relocate to a new headquarters in a foreign country in which bargaining agreement would be unenforceable, carrier's conduct raised a major dispute and violated § 2 Fourth). On the other hand, there are certainly situations in which a carrier or its parent could permissibly form a separate and fully independent company which would hire new pilots to fly separate routes neither flown by nor even certificated to the pre-existing carrier. In such a case, any attempt by the union of the pre-existing carrier to force recognition by the new corporation would raise a representation dispute under § 2 Ninth and would be within the exclusive jurisdiction of the NMB. *Cf. Summit Airlines v. Teamsters Local Union No. 295*, 628 F.2d 787 (2d Cir. 1980) (union could not, even in absence of competing union, bypass § 2 Ninth and use economic coercion to force recognition where its representative status was in doubt). In the present case, the complaint

admits that TXI had not been flying the New York-Washington route,[5] that the work of TXI pilots is not being terminated or curtailed, and that the activities of TXI are not being abandoned, but alleges that TXI is authorized to fly the new route and is using New York Air to do so. ALPA argues that in light of TXI's incestuous relationship with its sister company, *all* work of New York Air must be performed pursuant to the collective bargaining agreement and applicable seniority provisions. The question, according to ALPA, is not whether ALPA is to be designated the new representative of the New York Air pilots, but whether TXI may, through establishment of a company it controls, evade the obligations of its collective bargaining agreement with ALPA. This argument, of course, simply assumes that which the district court was unwilling to decide—that TXI and New York Air should be treated as a single carrier. Although the question is a close one, we agree with the district court that this issue is committed to the jurisdiction of the NMB.

### A. Judicial Intervention in the RLA

The role of the courts in enforcing substantive obligations under the RLA is circumscribed by the Act's unique history and dispute-resolution framework. The history of the RLA was recently recounted by this Court in *Summit Airlines v. Teamsters Local Union No. 295, supra,* and need not be rehashed here. For present purposes, it is sufficient to state that the Act was the product of agreement between the carriers and the unions, based on extensive negotiation and compromise as well as decades of experience with railroad labor legislation. *See, e. g., Chicago & North Western Rail-*

---

**5.** ALPA's complaint alleged that New York Air was the result of a plan "to institute additional service" using "new and different pilots" to fly "routes to be instituted." Complaint ¶ 13 (A. 7). *See also* ¶¶ 14, 19, 20, 22. On appeal, ALPA contends that the complaint was not limited only to "new operations" by calling our attention to the fact that New York Air is certificated to fly many of the same routes now certificated to TXI. In the first place, these allegations appear nowhere in the record and

there is no indication that they were brought to the attention of the district court. In the second place, as New York Air points out, it is common in the airline industry for a carrier to conduct *operations* on only a small proportion of the routes for which it holds CAB certificates. While we do not say that certification is irrelevant, ALPA's appellate contentions in this case do not persuade us that Judge Nickerson mischaracterized the allegations of the complaint.

way v. United Transportation Union, 402 U.S. 570, 588–93, 91 S.Ct. 1731, 1741–1743, 29 L.Ed.2d 187 (1971) (Brennan, J., dissenting). In a very real sense, the RLA was "a product of the parties rather than of the Congress." Risher, The Railway Labor Act, 12 B.C. Indus. & Com.L.Rev. 51, 54 (1971). See International Association of Machinists v. Street, 367 U.S. 740, 758, 81 S.Ct. 1784, 1794, 6 L.Ed.2d 1141 (1961). The agreement which resulted "was a unique blend of moral and legal duties looking toward settlement through conciliation, mediation, voluntary arbitration, presidential intervention, and finally, in case of ultimate failure of the statutory machinery, resort to traditional self-help measures." Chicago & North Western Railway v. United Transportation Union, supra, 402 U.S. at 589, 91 S.Ct. at 1741 (Brennan, J., dissenting). And while the Act does impose certain legally enforceable obligations, see infra, "large areas of the field still remain in the realm of conciliation, mediation, and arbitration." Switchmen's Union v. National Mediation Board, 320 U.S. 297, 302, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943).

In this case, ALPA chose not to invoke the various dispute-resolution mechanisms of the Act,[6] but instead sought judicial intervention to prevent what it perceived as an illegal attempt by TXI to circumvent its collective bargaining obligations. In certain instances, the courts have stepped in to prevent a party from engaging in conduct which undermines the fundamental provisions of the RLA. For example, in Texas & N.O.R. Co. v. Brotherhood of Railway Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930), the carrier and the union were involved in a wage dispute. After the controversy had been referred to the NMB, the carrier formed a "company union" and sought to intimidate members of the Brotherhood to join. Subsequently, despite a district court injunction to the contrary, the carrier recognized the company union as the bargaining representative of the employees and refused to recognize the Brotherhood. The Supreme Court ruled that § 2 Third, which requires that the designation of representatives be without "interference, influence, or coercion by either party over the designation of representatives by the other," was crucial to the functioning of the RLA and was therefore judicially enforceable:

> All the proceedings looking to amicable adjustments and to agreements for arbitration of disputes, the entire policy of the Act, must depend for success on the uncoerced action of each party through its own representatives to the end that agreements satisfactory to both may be reached and the peace essential to the uninterrupted service of the instrumentalities of interstate commerce may be maintained. There is no impairment of the voluntary character of arrangements for the adjustment of disputes in the

6. The Act, as amended, establishes different dispute-resolution mechanisms for different types of disagreements. "Major disputes," which involve attempts to change rates of pay, rules, or working conditions, 45 U.S.C. § 155 First (a), see Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 722–23, 65 S.Ct. 1282, 1289–1290, 89 L.Ed. 1886 (1945), are to be resolved by an elaborate process involving conference, mediation, arbitration, and occasionally emergency presidential intervention. See Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). "Minor disputes," which involve grievances over the "meaning or proper application of a particular provision" in an existing collective bargaining agreement, see Elgin, J. & E. Ry. v. Burley, supra, 325 U.S. at 723, 65 S.Ct. at 1289, are to be resolved through binding arbitration before an adjust-

ment board whose awards are "final and binding" upon the parties and enforceable in the district courts. 45 U.S.C. § 153 First (m), (p). "Representation disputes," which involve controversies surrounding the designation and authorization of representatives of employees covered under the RLA, are committed to the exclusive jurisdiction of the NMB. 45 U.S.C. § 152 Ninth. See Switchmen's Union v. National Mediation Board, supra. The NMB must, upon the request of either party, investigate the representation dispute and certify within 30 days the representative of the craft or class of employees in question.

On this appeal, ALPA has vigorously contended that the allegations of the complaint raised a "major dispute" under the RLA. ALPA Br. at 29. We do not decide this issue. We hold only that judicial intervention is not proper at the present time.

imposition of a legal obligation not to interfere with the free choice of those who are to make such adjustments. On the contrary, it is of the essence of a voluntary scheme, if it is to accomplish its purpose, that this liberty should be safeguarded.

*Id.* at 569, 50 S.Ct. at 433.

Similarly, in *Virginian Railway v. System Federation No. 40, supra,* the carrier refused to recognize and treat with the union certified by the NMB and instead organized a company union. Relying on the *Texas & N.O.R. Co.* case, the Court upheld an injunction restraining the carrier from interfering with the § 2 Third rights of its employees by fostering a company union. Further, the Court held that the requirement of § 2 Ninth that the carrier treat with the representative certified by the NMB was judicially enforceable. The Court recognized that, absent judicial enforcement of the certification procedure provided for in § 2 Ninth, the statutory scheme of the NMB could not function:

> The statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences—in short, to enter into a negotiation for the settlement of labor disputes such as is contemplated by § 2, First.

300 U.S. at 548, 57 S.Ct. at 599.

Finally, in *Chicago & North Western Railway v. United Transportation Union, supra,* the Court relied on three factors in holding that the requirement of § 2 First to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions" imposes a judicially enforceable obligation: (1) the obligation was central to the effective functioning of the Act, (2) the courts were capable of enforcing the duty, and (3) judicial enforcement was necessary because the NMB, as an essentially neutral and nonad-

judicative body, was unable to police the good faith requirement.

ALPA argues that these cases support its request for judicial intervention. The formation of New York Air, ALPA charges, is no different in principle from the formation of the company union forbidden in *Texas & N.O.R. Co.*: in both cases, the carrier engaged in unilateral activity aimed at undermining the statutory right of employees to select and deal with the representative of their choice. ALPA asks us to "disestablish" New York Air for bargaining purposes, just as the Court disestablished the company union in *Texas & N.O.R. Co.* Similarly ALPA argues, the *Virginian Railway* Court enforced the carrier's duty to treat with the duly designated union and to exert every effort to make and maintain agreements, without construing the action as a "representation dispute." Finally, ALPA points out that the *Chicago & North Western Railway* Court specifically held that the good faith obligation of § 2 First—an obligation alleged to have been breached by TXI's conduct here—was outside the jurisdiction of the NMB. Thus, the union argues, the district court erred in dismissing the complaint and remitting the controversy to the Board.

We think that ALPA's reliance on these cases is misplaced. The thread which runs through the intervention cases is summarized in *Switchmen's Union v. National Mediation Board, supra,* 320 U.S. at 300, 64 S.Ct. at 97:

> In those cases it was apparent that but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act. The result would have been that the "right" of collective bargaining was unsupported by any legal sanction. That would have robbed the Act of its vitality and thwarted its purpose.

As Justice Brennan stated, "the underlying cohesiveness of the decisions lies in the fact that in each instance the scheme of the Railway Labor Act could not begin to work without judicial involvement." *Chicago &*

*North Western Railway v. United Transportation Union, supra,* 402 U.S. at 595, 91 S.Ct. at 1744 (Brennan, J., dissenting). In this case, however, intervention would necessarily involve this Court in determining, as a substantive matter, whether ALPA is the proper representative of the New York Air pilots. We would thus be proceeding beyond the straightforward commands of the statute into gray areas not intended for judicial involvement. As the Court stated in *General Committee v. Missouri-K.-T.R. Co.,* 320 U.S. 323, 335, 64 S.Ct. 146, 151, 88 L.Ed. 76 (1943):

> In the *Clerks* case and in the *Virginian Ry. Co.* case the Court was asked to enforce statutory commands which were explicit and unequivocal. But the situation here is different. Congress did not attempt to make any codification of rules governing these jurisdictional controversies. It did not undertake a statement of the various principles of agency which were to govern the solution of disputes arising from an overlapping of the interests of two or more crafts. It established the general principles of collective bargaining and applied a command or prohibition enforcible by judicial decree to only some of its phases.

Moreover, in this case, unlike *Chicago & North Western Railway,* the NMB is empowered to, and has shown itself able to, decide representation disputes arising out of corporate restructurings. For example, in *Republic Airlines, Inc.,* 8 NMB No. 15 (October 14, 1980), a representation dispute arose following the acquisition of Hughes Airwest by Republic Airlines. The Aircraft Mechanics Fraternal Association, the representative of a class of employees at Hughes Airwest, contended that the union's representative status should survive the merger, since Hughes Airwest would continue to operate (under a different name) as a legally separate corporate entity. In ruling that the merger would result in only one company for RLA purposes, the Board contrasted its approach with that of the CAB:

> The CAB may approve of a two corporation set-up for purposes of economic regulation, however, this Board may

pierce the corporate veil for purposes of rational labor-management relations. A finding that Republic West is a separate carrier would exalt form over substance.

As the district court found, the NMB "has shown itself alert to prevent carriers from frustrating representation rights by artful corporate devices." 502 F.Supp. at 425. The Board recently demonstrated this alertness in *Pan American World Airways,* 7 NMB No. 92 (December 28, 1979):

> The purpose of the Railway Labor Act is to provide employees of covered carriers with a free choice as to their collective bargaining representative. The Act does not contemplate that carriers will be able to frustrate such rights by the use of corporate shells which were in fact created for other purposes and the National Mediation Board will look behind such devices to determine the appropriate operating entity thereby allowing employees the rights which are granted to them.

*See also Air Cleveland, Inc.,* 8 NMB No. 17 (October 16, 1980) (relying on financial and operational consolidation in holding that two related companies were one carrier for RLA purposes); *Ground Services, Inc.,* 8 NMB No. 35 (November 18, 1980) (relying on numerous variations among GSI's local operations in concluding that its employees were not a nationwide system for purposes of representation); *Donora Southern Railroad,* 2 NMB No. 80 (May 8, 1952) (declining to treat six sister carriers as a single carrier for clerical representation purposes). Thus, unlike *Chicago & North Western Railway,* there is no regulatory vacuum which the court must step in to fill. Under these circumstances, we feel that the district court correctly declined to intervene and properly analyzed the case under the rubric of a representation dispute.

### B. *Representation Cases*

The starting point for assessing the role of the courts in matters involving representation disputes is *Switchmen's Union v. National Mediation Board, supra,* and the two companion cases decided therewith, *General Committee v. Missouri-K.-T.R. Co., supra,*

and *General Committee v. Southern Pacific Co.*, 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85 (1943). In *Switchmen's Union*, the NMB had, pursuant to § 2 Ninth, certified a representative to the carrier after designating the appropriate craft and conducting an election. The defeated union sued to cancel the NMB's certification of the representative. The Court held that the action was not justiciable, ruling that the jurisdiction of the NMB under § 2 Ninth was exclusive and its determinations nonreviewable. The Court stressed that representation disputes were among the most controversial areas in the RLA, and pointed out that Congress, in drafting § 2 Ninth, had provided a special procedure by which the NMB could decide such disputes without impairing its neutrality. The Court concluded that there was no place for judicial intervention in such a scheme:

> Where Congress took such great pains to protect the Mediation Board in its handling of an explosive problem, we cannot help but believe that if Congress had desired to implicate the federal judiciary and to place on the federal courts the burden of having the final say on any aspect of the problem, it would have made its desire plain.

320 U.S. at 303, 64 S.Ct. at 98. Similarly, in *Missouri-K.-T.R. Co.*, the Court refused to review an NMB determination which resolved the competing claims of rival unions to represent the same group of employees. After reviewing the history of the Act and the role of courts in enforcing its provisions, the Court stated:

> It is clear from the legislative history of § 2, Ninth that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees. However wide may be the range of jurisdictional disputes embraced within § 2, Ninth, Congress did not select the courts to resolve them. To the contrary, it fashioned an administrative remedy and left that group of disputes to the National Mediation Board. If the present dispute falls within § 2, Ninth, the administrative remedy is exclusive.

320 U.S. at 336, 64 S.Ct. at 152 (footnotes and citations omitted).

This Court has held that as soon as the action reveals a representation dispute, the court is required to dismiss the complaint. *Ruby v. American Airlines, Inc.*, 323 F.2d 248, 255 (2d Cir. 1963), *cert. denied*, 376 U.S. 913, 84 S.Ct. 658, 11 L.Ed.2d 611 (1964). In *Ruby*, ALPA and one of its subunits responsible for bargaining with American Airlines could not agree on the contract requirements for the carrier. ALPA sued to enjoin American from bargaining with the subunit. Shortly thereafter, the subunit spun off from ALPA, formed a separate union consisting of more than 80 percent of American's pilots, and sought NMB certification pursuant to § 2 Ninth. In seeking to avoid dismissal, ALPA maintained that the purpose of its action was to prevent conduct by the carrier which was said to "violate various commands of the Act, notably the mandate of § 2 Fourth that an employer shall not 'influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization.'" *Id.* at 253. This Court rejected the argument, holding that "the courts cannot properly require an employer to bargain with a previously designated representative in the face of a substantial representation dispute requiring the intervention of the Mediation Board under § 2 Ninth." *Id.* at 255.

Analogous representation difficulties have arisen in the context of mergers. For example, in *International Association of Machinists v. Northeast Airlines*, 536 F.2d 975 (1st Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 328 (1976), the plaintiff union had been the representative of certain Northeast Airlines employees prior to a merger with Delta. The union sued Delta, claiming that Delta's failure to bargain violated its substantive duties under the RLA. In affirming the dismissal of the complaint, the court stated:

> At the very least, the merger created real doubts about whether plaintiffs represent

**24**

the majority of any Delta craft or class of employees, and where there is such doubt, federal courts leave resolution of the dispute to the National Mediation Board. *Id.* at 977.

■ We recognize that this case does not present a traditional representation dispute; there is no rival union and there has been neither an application to nor a certification by the NMB. Nevertheless, even in such unconventional contexts "section 2, Ninth affords the sole and mandatory means for resolving disputes over representation." *Summit Airlines v. Teamsters Local Union No. 295, supra,* 628 F.2d at 793. In *Summit Airlines,* a local chapter of the Teamsters Union sought to force the carrier to recognize that union as the collective bargaining representative of Summit's cargo handlers at one of Summit's twenty-one stations. Summit refused to recognize the union and urged a secret-ballot election conducted by the NMB. Instead, the union picketed the cargo station in an attempt to force Summit to recognize the union. The district court found that the union's conduct violated the obligation of § 2 First to "exert every reasonable effort to ... settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof," 45 U.S.C. § 152 First, and enjoined the union from engaging in further economic coercion for the purpose of forcing recognition. In concluding that the absence of a rival union is not controlling, this Court held that the dispute requirement of § 2 Ninth is satisfied "even though only one union seeks representation[,] if some employees are indifferent or hostile to being represented by that union or by any other union." *Id.* at 793 n.3. Relying on the "language of the statute and the dominant statutory purpose," *id.* at 794, the Court concluded that the union could not "ignore the section 2, Ninth procedure and resort instead to economic coercion," *id.* at 795.

■ In this case, ALPA has invoked judicial intervention rather than economic coercion in an attempt to force TXI to apply the bargaining agreement to the New York Air operation. While there are significant differences between the means selected in these two cases, the necessary consequence is the same: involvement of the courts in the substantive merits of representation disputes. As we have stated, neither the framework and history of the RLA nor the cases authorizing judicial intervention under the Act support such an expanded role. Where a representation dispute appears on the face of the complaint, even in the absence of a challenge by a competing union or an application to the NMB, the court is bound to dismiss the action. *See Ruby v. American Airlines, Inc., supra.* And while we recognize that the representation dispute in this case is murky, its presence, together with the traditionally narrow role of the courts in enforcing the RLA, requires us to conclude that we lack subject matter jurisdiction over this action.

The judgment of the district court is therefore affirmed.