Frank Robbins **DORSEY**, Plaintiff,

v.

**UNITED PARCEL SERVICE CO.**, Defendant.

Civil Action No. 3:96–CV–256–H.

United States District Court,
W.D. Kentucky,
Louisville Division.

Sept. 30, 1998.

618

Edward K. Black, LaGrange, KY, for plaintiff.

Charles Laurence Woods, III, Matthew R. Westfall, Westfall, Talbott & Woods, Louisville, KY, for defendant.

## MEMORANDUM OPINION

HEYBURN, District Judge.

Is Plaintiff Frank Dorsey a manager or an employee? The answer to that question decides this case. Dorsey attempted to unionize a group of workers at Defendant United Parcel Service Co. ("UPS") and the company appears to have fired him because of his activism. If Dorsey is an employee, then UPS violated his rights, under the Railway Labor Act ("RLA"), to organize and bargain collectively. See 45 U.S.C. § 152, Fourth. On the other hand, if Dorsey is a manager, then the RLA provided him with no protection.

The Magistrate Judge found the case unsuitable for Rule 56 disposition. However, both Dorsey and UPS objected to the Magistrate's recommendation and urge the Court to resolve the case. The Court agrees that it is ripe for resolution. Both parties have finished discovery and have presented their complete proof to the Court. The parties do not urge the Court to resolve questions of credibility or of fact. The Court need only consider the facts in record and determine the outcome of a multi-factor test to decide the question of Dorsey's status. However, it is not an easy task. The closeness of the case, however, does not prevent the Court from resolving it.

The dispute between Dorsey and UPS had its genesis in undisputed events occurring during the spring of 1995 when Dorsey, a pilot with the title of captain, served as a B–

747 Flight Training Supervisor. He and other members of a group of Flight Qualified Supervisors (a classification that includes Flight Training Supervisors, Flight Test Supervisors, Systems Operations Supervisors, Flight Standards Supervisors, and Assistant Chief Pilots) requested that the Independent Pilots Association ("IPA") agree to represent them. The IPA was certified to represent Flight Deck Crew Members at UPS. The Flight Qualified Supervisors wanted the union to include them within that classification. The IPA's collective bargaining agreement ("CBA") defines "Crewmembers" as including Captains, First Officers, Professional Flight Engineers, and Second Officers. The CBA, however, specifically excludes Management Crewmembers although the contract conspicuously fails to define that classification. Out of courtesy to the company, Dorsey initiated a series of meetings with UPS management to explain that the group of Flight Qualified Supervisors had organized to determine their employment status under the RLA and, thus, their eligibility for union representation. By the end of June, 1995, events had taken a turn for the worse for Dorsey. After he wrote to all Flight Qualified Supervisors about the efforts to gain union representation, the IPA informed Dorsey's group of its refusal to recognize the eligibility of Flight Qualified Supervisors. Meanwhile, UPS relieved Dorsey of some duties and, then, reassigned him to the position of Assistant Chief Pilot. A UPS manager told Dorsey that the company transferred him because of his "recent activities." Later in the summer of 1995, Dorsey received a low performance evaluation. Early in the fall, UPS managers confronted Dorsey directly. Flight Operations Manager Rob Ruf told Dorsey, "I want this action to stop right now." Ruf reassured Dorsey that, if Dorsey ceased his organizing efforts, the company would take no further action and would "put this matter behind us." Ruf intimated that Dorsey might receive a transfer back to flight training if he acceded to management's requests. Finally, Ruf threatened that the company would fire Dorsey if he continued his activities.

Apparently undeterred, Dorsey and several other Flight Qualified Supervisors filed an Application for Investigation of Representation Dispute with the National Mediation Board ("NMB"—the entity granted exclusive jurisdiction over representation matters under the RLA, see *Air Line Pilots Ass'n v. Texas Int'l Airlines, Inc.*, 656 F.2d 16, 24 (2d Cir.1981)). While the NMB considered the complaint, UPS met with Flight Qualified Supervisors (except those in Dorsey's group) and promised them that conditions and pay would improve. Ruf told the workers that the complaint had no merit and "zero chance for success." Meanwhile, UPS managers let it be known that all signers of the application would be fired if the NMB ruled for the company. Unfortunately for Dorsey, in February of 1996, the NMB did rule for UPS. A month later, the same day that the NMB rejected a request for reconsideration, UPS fired Dorsey for "actions detrimental to the best interests of the company." During discovery, UPS admitted that it dismissed Dorsey solely because of his attempt to gain union representation for Flight Qualified Supervisors.

Dorsey, of course, brought this lawsuit. Initially, he pursued UPS and the IPA under both federal and state law. He charged UPS with wrongful discharge in retaliation for conduct protected by the RLA and he claimed that the IPA violated its duty of fair representation. Eventually, Dorsey's case was winnowed down. Now, all that remains are his claims against UPS under the RLA and under Ky.Rev.Stat.Ann. § 336.130. Dorsey seeks reinstatement as a Flight Training Supervisor, back pay and benefits, and punitive damages.

■ The RLA, rather than the National Labor Relations Act ("NLRA"), covers the airline industry because, in 1936, Congress amended the RLA and included air carriers under the statutory definition of "carrier." *Compare* 45 U.S.C. § 182 (including air carriers within the RLA's definition of "carrier") *with* 29 U.S.C. § 152(3) (defining "employer" for NLRA purposes). In any event, the RLA grants employees the right to participate in union activities and the right to organize union representation. As the RLA states: "No carrier ... shall deny or in any way question the right of its employees to

join, organize, or assist in organizing the labor organization of their choice." 45 U.S.C. § 152, Fourth. Crucially, the RLA provides this protection only to "employees and subordinate officials," not to managers. *See* 45 U.S.C. §§ 151, Fifth; 181. In other words, UPS violated the RLA only if Dorsey was labor rather than management.

Unfortunately, the Court faces a challenge in determining Dorsey's status. UPS, of course, employs workers who obviously fall into the labor category and others who obviously qualify as management. In this case, the parties agree that Flight Deck Crew Members are labor and that Chief Pilots are management. The difficulty arises because UPS, like many other large companies, may also employ people who do not fall in the management camp even though they possess some supervisory duties or a title suggesting supervisory responsibility. The RLA itself recognizes the difficulty of classifying such workers. As one district court explained, "the RLA's use of the term 'subordinate official,' in addition to the use of 'employee,' suggests that certain employees performing functions intermediate between those of the typical employee and management official could fall under the scope of the Act." *Podlesnick v. Airborne Express, Inc.*, 550 F.Supp. 906, 909 (S.D.Ohio 1982); *see also* 48 Am.Jur. § 49 "Factors in Distinguishing Management From Employees" (1994). Thus, there is no convenient bright line separating labor from management.

■ Since it is no simple matter to discern the status of a worker who possesses indicia of supervisory authority, the NMB has articulated a test with no less than eleven factors to determine the management or labor status of an airline worker.[1] As with most multi-factor tests, the outcome depends on the totality of the circumstances rather than on the influence of any single factor. The NMB explains that it considers the factors cumulatively not separately. *See Comair, Inc.*, 22 NMB 175, 180 (1995); *Aerovias de Mexico*, 20 NMB 584, 594 (1993). The

eleven factors are: 1) the employee's participation in benefits available to subordinate officials and employees; 2) the authority and extent to which carrier funds may be committed; 3) the authority to create carrier policy; 4) the ability to bind the carrier in dealings with outside parties; 5) the authority to discharge and discipline employees or to effectively recommend discharge and discipline; 6) the extent of supervisory authority; 7) the ability to authorize or grant overtime; 8) the authority to transfer or establish assignments; 9) the placement of the individual in the organizational hierarchy of the carrier; 10) the employment relations of the individual with the carrier; and 11) the employee's method of compensation. *See American Airlines, Inc.*, 24 NMB 521, 561 (1997); *Pan American World Airways, Inc.*, 5 NMB 112, 115 (1973).

■ The Kentucky statute similarly provides its protection only to employees. *See* Ky.Rev.Stat.Ann. § 336.130(1). Kentucky, however, has not set out a test for determining the status of worker. Therefore, the Court will treat the results of the eleven-factor test as conclusive of Dorsey's status under both the federal and state statute. *Cf. Marine Officers Ass'n v. Ohio River Sand Co.*, 467 S.W.2d 758, 762–63 (Ky.1971) (accepting NLRB finding of managerial status as determinative of rights under Kentucky's statute). If Dorsey's federal claim fails because he qualifies as a manager under the RLA, and assuming that the RLA does not completely preempt the Kentucky law, then Dorsey's state claim would likewise fail.

To prevail Dorsey must establish that he engaged in an activity protected by the RLA and that UPS fired him because of animus toward that activity. *See Lebow v. American Trans Air, Inc.*, 86 F.3d 661, 665–66 (7th Cir.1996) (applying the NLRA burden-shifting approach to RLA claims). Because UPS has admitted to terminating Dorsey because of his attempts to gain union representation, the only issue is whether the RLA applied to

---

1. The NMB propounded this test to resolve representation disputes. Courts, however, have borrowed the NMB's criteria to resolve questions regarding a worker's status for claims brought against carriers under the RLA. *See, e.g., Podles-* *nick,* 550 F.Supp. at 908. Given the NMB's expertise in administering the RLA, the Court agrees that it is appropriate to defer to its authority by analyzing claims according to the NMB's test.

Dorsey. Thus, Dorsey must prove that he was an employee or subordinate official rather than a manager. In other words, if the evidence is in equipoise, then UPS prevails. *Cf. Director v. Greenwich Collieries,* 512 U.S. 267, 275–78, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994) (holding that the employee bears the burden to prove a prima facie case under the NLRA).

■ Before launching into the eleven-factor test, however, the Court must address a preliminary dispute. Should the Court analyze Dorsey's first position as a Flight Training Supervisor or his second job as an Assistant Chief Pilot? Dorsey urges the Court to examine the characteristics of his initial post, presumably because they tend toward labor rather than management. UPS contends that the Court should look only to the later job. While the Court harbors some concern that UPS deliberately transferred Dorsey into a position with more management characteristics in order to facilitate termination, Dorsey did not allege in his amended complaint that the transfer constituted an act of impermissible retaliation under the RLA. Instead, the gravamen of Dorsey's claim is that UPS wrongfully discharged him in violation of the RLA. Accordingly, the parties conducted no discovery on the issue of Dorsey's transfer. Therefore, because Dorsey alleged wrongful termination rather than some other form of retaliation, the Court will analyze the characteristics of the position from which UPS discharged Dorsey—the job of Assistant Chief Pilot ("ACP").

Turning, finally, to the first factor: the employee's participation in benefits available to subordinate officials and employees. Neither party presents any proof on this issue. The Court presumes that potential proof might include evidence that ACPs took part in pension or health programs open only to unionized employees. The only related evidence is more pertinent to another factor. Dorsey does receive stock incentives. Without other proof, this factor does not help Dorsey.

The next factor is the worker's authority to commit carrier funds and the extent to which carrier funds may be committed. Dorsey argues that ACPs have extremely limited authority to commit UPS funds. UPS, on the other hand, points to ACPs' authority to purchase meals and accommodations for crewmembers. Similarly, UPS notes that ACPs sign reimbursement forms. In addition, ACPs have responsibility for fuel conservation which carries with it significant financial implications. UPS also details the assignment of ACPs to various decision-making committees. UPS has assigned ACPs to set up new airport operations and to coordinate air shows. UPS notes that ACPs regularly coordinate relations between the company and the airports out of which UPS flies. These liaison duties may result in the expenditure of funds to resolve specific problems. Finally, UPS details Dorsey's work on a flight simulator project in 1991. Dorsey recommended changes in the design of the simulator which resulted in UPS expenditures.

The Court tends to agree with Dorsey that ACPs have limited discretion to spend UPS's money. Their ability to purchase meals and accommodations and their authority to sign reimbursements is merely an administrative function. They do not set the policy or the budget; they merely screen requests to determine whether the expenditures fall within defined parameters. Similarly, ACPs do not have the power to set fuel cost policies or budgets. Instead, they spend UPS funds only as they implement fuel policy decisions. *But cf. Northwest Airlines,* 15 NMB 64 (1987) (finding that fuel analyst possessed authority to commit carrier funds by monitoring fuel inventories). Regarding ACPs on special assignment to committees, the Court cannot determine whether these assignments occur so often that it would be fair to describe them as a regular part of an ACP's duties. Nor can the Court conclude that ACPs routinely have significant power on these committees. While ACPs act as liaisons with their airports, UPS presented no specific evidence on how this role results in budgetary authority. Finally, the Court rejects UPS's evidence of Dorsey's work on the flight simulator because Dorsey did not occupy the ACP position in 1991. In sum, ACPs have some minimal authority to spend company money. However, this is not enough authority to evidence a role as managers.

See *Midway Airlines, Inc.,* 18 NMB 193 (1991) (finding workers to be employees despite authority to co-sign checks for purchase of fuel); *Pan American,* 5 NMB at 119 (finding Production Foremen to be employees based, in part, on lack of participation in formulation of departmental budget). *But see American Airlines,* 24 NMB 521 (finding Maintenance Supervisors to be management officials based, in part, on authority to order equipment and make maintenance decisions).

The third criterion is the authority to create carrier policy. Dorsey explains that ACPs have no power to author policy. Instead, ACPs carry out policies contained in manuals created by the training managers or the System Chief Pilot. According to UPS documents, no one below the level of Chief Pilot can originate or issue policy. Dorsey admits, however, that ACPs may suggest changes in policy. UPS counters by explaining, again, that ACPs have served on numerous policy-development committees and in representing UPS at new airports. UPS also explains that the company often assigns ACPs the job of writing training and operations manuals.

On balance, Dorsey seems to come out slightly ahead on this factor. Officially, ACPs possess no free-standing authority to make UPS policy. Occasionally, maybe even frequently, ACPs receive that authority as part of an assignment. The Court does not believe that the delegation of power in specific instances amounts to the same thing as the independent possession of that power. *See Pan American World Airways, Inc.—Flight Instructors,* 4 NMB 129, 138 (1967) ("Assuming, arguendo, that [a] function is part of management's duty, the conclusion does not necessarily follow that because management has delegated one of its functions to an individual that the person thenceforth becomes a member of management."). Because UPS's official procedures confer the power to originate policy only upon higher placed workers, the Court concludes that ACPs lack that power. On the other hand, ACPs are not without significant influence and voice in the formulation of UPS's policies. The company often turns to them for advice and input. Therefore, this factor points in favor of Dor-

sey's status as an employee, but it does not go very far toward proving Dorsey's case. *See Pan American,* 4 NMB at 136 (finding workers to be employees based, in part, on carrier documents that conferred policy-making power to superiors); *American International Airways, Inc.,* 20 NMB 94 (1992) (finding workers to be employees even though the carrier assigned them to special projects, including the revision of manuals). *But see American Airlines,* 24 NMB 521 (finding Maintenance Supervisors to be management officials based, in part, on limited authority to modify local policy on day-to-day basis and revisions to technical manuals).

The fourth factor in the test is the ability to bind the carrier in dealings with outside parties. UPS points to the service of ACPs on various committees and as liaisons with host airports. The Court cannot determine that the ACPs serve on committees so often that the assignments constitute part of the job description, nor can the Court conclude that ACPs possess enough power on these committees to say that they have the authority to bind the company. Regarding the ACPs' work as liaisons, UPS makes a somewhat stronger argument. In this job, ACPs essentially act as intermediaries between the company and outside parties. While UPS does describe the ACPs' ability to resolve minor problems with the host airports, the company presented minimal evidence of the extent to which ACPs bind the company on any matter of import. Therefore, the Court concludes that this factor only marginally favors UPS.

The Court moves next to the most hotly disputed factor: whether the worker has the authority to discharge and discipline employees or to effectively recommend discharge and discipline. In keeping with NMB decisions, the Court will look not only at whether ACPs possess the authority to recommend sanctions, but at whether ACPs actually exercise that authority. *See Aerovias de Mexico,* 20 NMB at 596.

Dorsey offers the deposition testimony of two Flight Qualified Supervisors. He construes that testimony to state that ACPs have no power to recommend discipline and that when ACPs have tried to do so they

have met with resistance by UPS. An examination of these depositions reveals that one witness complains only of her own experience, and she is not an ACP. The other witness speaks merely of one incident in which UPS apparently canceled a discipline hearing without notice to the deponent, an ACP. The Court does not believe that these two pieces of evidence add up to the broad conclusion that Dorsey advances. These facts do serve to cast some small doubt on the effectiveness of an ACPs' role, but they do not constitute evidence of general applicability so much as they amount to anecdotal examples.

UPS, in contrast, offers far more comprehensive evidence of the ACPs' role in the discipline process. First of all, the company admits that ACPs have no independent authority to discipline a worker. The ACP is but the first step in a system of progressive discipline governed by the IPA's collective bargaining agreement ("CBA"). The ACP investigates Pilot Exception Reports and recommends further action. Importantly, an ACP confers on any response with the Chief Pilot. The ACPs may place the report or a letter of concern or warning in an employee's file. Such a letter, however, does not constitute "discipline" in and of itself. Along with the letter, the ACP may recommend discipline—the loss of pay, the loss of a benefit, or suspension—but all of these consequences would invoke the procedures dictated by the CBA. UPS explains that any discipline decision is made based on the employee's file, thus giving ACPs a significant role in the process. UPS introduced many examples of warning and concern letters from ACPs. These documents amply show that ACPs cautioned employees about the possibility of disciplinary action. More importantly, UPS offers the deposition testimony of Flight Operations Manager Rick Barr who stated that ACPs have recommended discipline as severe as suspension and termination and that those recommendations have been followed. UPS argues that, while the CBA circumscribes the ACP's authority as a first-line supervisor, the contract does not render his position ministerial. *See American Airlines,* 24 NMB at 563 (finding Maintenance Supervisors to be management officials despite CBA that circum-

scribed their authority to resolve grievances). Instead, UPS contends that the ACP is the first step in the discipline process and, therefore, a member of management.

Dorsey argues that, because an ACP's recommendation is no more than advisory, the ACP lacks any power to effectively recommend discipline. *See Pan American,* 5 NMB at 118 (finding workers to be employees and explaining that a Production Foreman's termination recommendations were merely advisory); *Midway Airlines,* 18 NMB at 201 (similar); *Metroflight, Inc.,* 18 NMB 103, 108 (1990) (similar). Dorsey also notes the very limited authority of the ACP to act alone. Dorsey explains that the ACP must confer with the Chief Pilot. Dorsey argues that the *American Airlines* decision does not help UPS because the Maintenance Supervisors in that case possessed some final authority to resolve grievances themselves.

The Court concludes that ACPs possess minimal authority to independently recommend discipline. Their job description says that they can recommend alone, but not act alone. It gives ACPs the power to place letters in an employee's file and to recommend the initiation of the discipline process. To take further action they must confer with the Chief Pilot. These facts powerfully favor UPS because this evidence shows that ACPs officially have the power to start the wheels of discipline turning. The many letters produced by UPS demonstrate that ACPs provide much of the paperwork upon which progressive discipline decisions might rest, but they do not show ACPs actually recommending discipline or termination. This distinction is crucial to the argument that ACPs act as managers. While the letters do not count for much, UPS advances its case significantly with Barr's deposition testimony. The senior UPS manager stated that ACPs did recommend discipline. The documentary evidence only partially supports this assertion. In the end, the Court finds that ACPs possess some powers consistent with managers, but lack many others. The net effect is only a very marginal plus for UPS.

The sixth factor is the extent of supervisory authority possessed by the worker. UPS

explains that ACPs supervise and evaluate the work of crew members. They perform line checks on those employees and help them comply with regulations, UPS policies, and the CBA. The ACPs receive grievances from employees and possess the authority to resolve grievances informally. If the ACP can resolve the grievance, the process stops. If the ACP can begin to resolve the grievance, the process halts while the ACP attempts a resolution. If the ACP cannot ameliorate the problem, then the ACP passes the grievance along and a formal process begins. UPS also points out that ACPs have supervisory authority in their liaison role and in their responsibility for weekend duty.

Dorsey counters by explaining that one deposition witness testified that some ACPs have no pilots to supervise at all. Dorsey also explains that, in all cases, the manuals state that crew members report through the ACP to the Chief Pilot. Dorsey also argues that under NMB decisions, the power to resolve grievances informally does not amount to managerial power. *See Pan American*, 5 NMB at 118. *But see Metroflight*, 18 NMB at 107 (stating that "the authority to definitively resolve grievances" indicates management authority).

Again, this factor is very close. ACPs do not have sweeping supervisory powers. Instead, they are the first line of supervisors above the crew members. The Court is persuaded, however, that the combination of small considerations tips the scales in favor UPS on this factor. ACPs evaluate the work of crew members rather than just directing their work on a daily basis. ACPs interpret the manuals and then regulations in order to explain those rules to the crew members and to ensure that the crew members adhere to those rules. This task confers crucial responsibility to the ACPs. Finally, the Court believes that the formal versus informal distinction distracts from the real issue which is whether ACPs resolve grievances. They do. The company has given ACPs the power to solve problems. ACPs must come up with creative solutions within the limits of company policy, federal regulation, and the union contract. This responsibility seems more consonant with management than with labor. The fact that ACPs accomplish this task without the imprimatur of a formal proceeding does not rob it of its significance. Therefore, the Court finds that this factor points in favor of UPS.

Turning to the next factor: the ability to authorize or grant overtime. The parties agree that the ACP possesses next to no power to decide on overtime. Therefore, the Court determines that this factor points in favor of Dorsey.

Similarly, the eighth factor—the authority to transfer or establish assignments—also helps Dorsey. UPS admits that the scheduling department designs assignments and then the crew members select those assignments through a bidding process under the CBA. The company does argue, though, that the manuals grant the ACP some limited power to authorize leave in urgent cases and to coordinate emergency scheduling. Because the ACP plays only the most minimal role in the assignment process, the Court finds that this factor points in Dorsey's favor.

The ninth factor is the placement of the individual in the organizational hierarchy of the carrier. This consideration tips strongly toward UPS. While Dorsey argues that the ACP is seven steps down from the company president, that fact tells the Court only that the company is large and hierarchical. The number of rungs on the ladder at UPS tells the court nothing about the actual role of the ACP. UPS provides far more useful information. The company employs 20 ACPs and 2000 pilots. As an ACP Dorsey personally supervised 89 pilots. UPS argues that these numbers show that ACPs are first line managers "positioned at the first level of management hierarchy." *American Airlines*, 24 NMB at 564.

The Court finds the numbers very persuasive. This is not a case in which a company has attempted to insulate workers from unionization by creating an unrealistically large management class. On the contrary, the ratio of ACPs to line workers demonstrates that the ACPs occupy a place in the organizational hierarchy typically inhabited by managers. This factor, thus, cuts strongly in favor of UPS.

UPS also prevails on the penultimate criterion: the employment relations of the individual with the carrier. According to UPS and to the IPA, all Flight Qualified Supervisors fall outside the classification created by the CBA. This fact is powerful evidence that ACPs are managers. While the Court certainly knows that union representation decisions are motivated by pragmatic considerations rather than idealism, the fact that the union has consigned ACPs to management indicates the validity of UPS's arguments. This is not a case in which the union is fighting to represent a group of workers over the objections of management. Instead this is an unusual case in which a sub-group of workers considered themselves entitled to union representation despite the union's lack of interest. The CBA itself recognizes a group of workers called Management Crewmembers. While the CBA does not define this group, it would seem to suggest the presence of some pilots who are not labor. ACPs would seem likely candidates for this category. The Court is, thus, persuaded that this factor points strongly in favor of UPS.

Finally, the eleventh factor—the employee's method of compensation—provides the strongest evidence that ACPs are managers rather than employees. ACPs receive a straight salary with no overtime. Union crew members receive a guaranteed minimum salary based on a specified number of hours beyond which they receive overtime pay. This distinction alone constitutes significant, but marginal, evidence of management status. The remainder of the ACPs' compensation package, however, tips the scales dramatically. ACPs take part in the Management Incentive Program, a stock participation plan not available to crew members. While important evidence, this fact is not unequivocal because ACPs receive half the rate of stock incentives as senior managers. In addition to these compensation considerations, ACPs also receive the same benefits packages as senior managers and other non-management administrative employees. ACPs also receive the same twelve-month sick leave salary continuation benefit as senior management. UPS explains that all of these considerations militate forcefully in favor of finding that Dorsey was a manager.

*See American Airlines, Inc.,* 24 NMB 521 (finding workers to be managers based, in part, on their salaries, their participation in profit sharing, their lack of overtime pay, and their participation in benefits identical to those offered to management).

Dorsey contends that compensation does not prove very much about a worker's status. He cites several NMB decisions for the proposition that a worker might receive a salary and still be an employee. *See United Airlines, Inc.,* 4 NMB 30, 37 (1965) (flight instructors compensated similarly to management, but still employees); *American International Airways, Inc.,* 20 NMB 93, 95 (1992) (salaried pilot, unlike pilot employees, still a subordinate); *Metroflight,* 18 NMB at 106–07 (shift supervisors salaried, unlike mechanics, but still employees).

It is true, as Dorsey argues, that compensation is not dispositive of management status. He also presents a strong case that the two-tiered stock compensation plan suggests the possibility that ACPs fall into an intermediate category as subordinate officers. Nevertheless, UPS has the better arguments on this factor. Every aspect of the ACPs compensation package makes the position look more like that of a manager than an employee. The most convincing fact is the participation of ACP in the stock incentive program—a benefit available only to managers. Thus, this final criterion points strongly in UPS's favor.

On balance, Dorsey prevails on four of the eleven factors. He comes out ahead on the ACPs' authority to commit funds, the ACPs' power to create policy, the ACPs' ability to grant overtime, and the ACPs' authority to establish assignments. Neither Dorsey nor UPS prevails on the ACPs' participation in employee benefits. UPS prevails narrowly on the ACPs' power to bind the company with outside parties and as to the ACPs' authority to recommend discipline. UPS wins the remaining four factors by offering more evidence of the ACPs' supervisory authority, the ACPs' placement in the hierarchy, the ACPs' employment relationship with the company, and the ACPs' compensation.

Analyzing the factors quantitatively alone, Dorsey fails to carry a plurality. However, quantity does not decide the issue always. Many of the factors are quite close or relatively unimportant. Some factors carry more weight than others. The ACP job is not a policy development position. Nor is it a job that interacts extensively, with the world beyond UPS. It is primarily a supervisory position. Therefore, several factors seem less relevant to this case than they might be to another. The ACPs' ability to make policy, commit funds, and bind the company all seem to address considerations only tangentially relevant to the ACP job. Similarly, given the size of UPS, the ACPs' limited participation in the development of assignments seems to offer little guidance. The real question in this case is whether, as a supervisor of crew members, the ACP acts as a manager or just as a senior employee.

While the ACP position almost seems to lie in limbo between labor and management, several considerations tip the balance. The job seems more aligned with management than with labor. The ACPs do not work on the same schedule as flight crew members. The ACPs do not spend the bulk of their time flying like crew members do. This is not a case in which a subordinate official works alongside employees on a daily basis, thus underscoring the similarity between the two jobs. On the contrary, the ACPs seem to have little in common with the crew members. UPS assigns ACPs with the job of bringing workers into compliance with policies and with evaluating their work. These supervisory tasks seem particularly oriented toward management. In carrying out these duties, the ACP seems more like management's representative to labor than like labor's representative to management. The compensation package underscores this distinction. The company has attempted to secure the ACPs' allegiance by offering stock incentives. When a company offers no similar incentives to labor, it seems compelling evidence of the dividing line between employee and manager. The Court is concerned that the discipline/termination factor was so confusing and that it only marginally favored UPS. This consideration seems the most relevant in determining managerial status. The

NMB, however, states that no single factor is necessary or dispositive. Considering all factors, this is obviously a close call. While the dividing line is very fine, the Court concludes that the ACP job lies on the management side.

The Court adds that this decision determines only Dorsey's rights under the RLA. It does not address broader representational questions regarding groups of workers at UPS. Such questions would be appropriately resolved by the NMB. The posture of this dispute required the Court to analyze the status of the ACP position, but the result in this case does not necessarily settle that matter in any other context. The only question really resolved by the Court today is whether Dorsey was an employee or subordinate official under the RLA. The Court made its decision based only on evidence presented by Dorsey and UPS. Conceivably, in another context, a court or other body could reach a divergent conclusion regarding the status of ACPs in a dissimilar dispute based on different evidence.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Each party has moved for summary judgment. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is SUSTAINED and Plaintiff's complaint is DISMISSED WITH PREJUDICE.

This is a final and appealable order.