**UNITED TRANSPORTATION UNION, Plaintiff–Appellant,**

v.

**GATEWAY WESTERN RAILWAY COMPANY, Defendant–Appellee.**

No. 95–2004.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1995.

Decided March 12, 1996.

Norton N. Newborn, argued, Clinton J. Miller, III, Daniel R. Elliott, III, United Transp. Union, Cleveland, OH, F. Lance Callis, Callis, Papa, Hale, Jensen, Jackstadt, Bailey & Halloran, Granite City, IL, for plaintiff-appellant.

Robert H. Wheeler, argued, Thomas J. Litwiler, Oppenheimer, Wolff & Donnelly, Chicago, IL, for defendant-appellee.

Before WOOD, Jr., ROVNER and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

The United Transportation Union ("UTU"), which represents certain train service employees of the Gateway Western Railway Company ("GW"), alleges that GW violated the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., when its wholly-owned subsidiary began operating with non-union employees. The district court dismissed UTU's complaint for lack of subject matter jurisdiction, finding that UTU had alleged a representation dispute that fell within the exclusive jurisdiction of the National Mediation Board ("NMB") under section 2 Ninth of the RLA, 45 U.S.C. § 152 Ninth. UTU appeals that dismissal, contending that under *Burlington Northern Ry. Co. v. United Transp. Union*, 862 F.2d 1266 (7th Cir.1988), its complaint alleges a "major" dispute over which the district court should have exercised jurisdiction. Because we agree with the district court, however, that the instant claim is not justiciable in federal court, we affirm the judgment below.

## I.

■ In considering a motion to dismiss for lack of subject matter jurisdiction, the district court must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor. *See Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir.1993). The parties here, however, also submitted evidentiary materials addressed to the jurisdictional question. Such evidence is properly considered at the dismissal stage when the question raised is one of subject matter jurisdiction. *See Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993) ("The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." (internal quotation omitted)); *Bowyer v. United States Dep't of Air Force*, 875 F.2d 632, 635 (7th Cir.1989), *cert. denied*, 493 U.S. 1046, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990); *Crawford v. United States*, 796 F.2d 924, 927–29 (7th Cir.1986).[1]

The complaint alleges that since at least 1990, UTU and GW have been parties to a series of collective bargaining agreements negotiated under the RLA. Each of those agreements required that GW use crews on its trains comprised of a conductor and one or two brakemen. In March 1993, GW attempted to negotiate a change in this re-

---

1. UTU acknowledges that it was proper for the district court to consider materials outside the complaint in assessing its subject matter jurisdiction. It agrees, moreover, that the evidence submitted on the jurisdictional question does not present a disputed issue of material fact. (See UTU Br. at 2 n. 1.)

quirement that would enable it to operate with conductor-only crews. UTU rebuffed those attempts to alter the crew consist requirement in the collective bargaining agreement.

UTU alleges that when the negotiations failed, GW devised an alternative means of implementing conductor-only operations. It formed a wholly-owned subsidiary, Gateway Eastern Railway Company ("GE"), that apparently would not be subject to the GW–UTU collective bargaining agreement. Through that subsidiary, GW proposed to purchase a new rail line over which the subsidiary would operate. On June 1, 1993, GE filed a notice of exemption with the Interstate Commerce Commission ("ICC") in connection with its proposed acquisition from the Consolidated Rail Corporation ("Conrail") of a twenty-two mile stretch of track between East St. Louis and East Alton, Illinois (the "East Alton line"). At the same time, Wertheim, Shroder & Co., Inc. ("Wertheim"), a non-carrier investment company that controlled GW, filed a petition for exemption pursuant to 49 U.S.C. § 11343 that would enable it to control multiple carriers. The two railways also filed with the ICC separate notices of exemption addressed to GW's acquisition of overhead trackage rights to a short segment of the East Alton line, and to the construction of a connecting track between the GW and GE lines in East St. Louis. UTU alleges that after the completion of these transactions, GE would operate as a "switching carrier" for GW.

The complaint alleges that while GW and GE are technically separate entities, they essentially operate as a single carrier. In that regard, UTU maintains that the two railways coordinate management, crew operations, and dispatching, and that they otherwise share facilities and equipment, including computer capabilities, maintenance of way equipment, and overhead functions such as accounting and engineering.

In July 1993, GW again attempted to bargain with UTU for permission to use conductor-only crews on the GE line, and it apparently reached a tentative agreement to that effect with a UTU official. That agreement, however, was subsequently rejected by the GW–UTU membership. In December 1993, UTU served notice on GW under section 6 of the RLA, 45 U.S.C. § 156,[2] that it was seeking changes in existing rates of pay, rules, and working conditions in connection with the negotiation of a new collective bargaining agreement. The proposed changes did not include conductor-only operations on the East Alton line. The parties met at least once to discuss these disputed matters, but they failed to reach an agreement. UTU alleges that GW then unilaterally implemented its plans by commencing to operate GE trains on the East Alton line with conductor-only crews. According to the union, this had the effect of depriving unionized employees of a work opportunity, and thereby constituted a change in working conditions subject to the status quo and mandatory bargaining requirements of section 2 First, section 2 Seventh, and section 6 of the RLA, 45 U.S.C. §§ 152 First & Seventh, & 156.[3] In its com-

2. That section provides as follows:

Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

45 U.S.C. § 156.

3. The referenced provisions of section 2 of the RLA provide as follows:

First. Duty of carriers and employees to settle disputes

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any

plaint, then, UTU requests a declaration that GW in fact is violating the referenced RLA provisions, and an injunction requiring that the status quo under the existing GW–UTU collective bargaining agreement be maintained.

In moving to dismiss UTU's complaint for lack of subject matter jurisdiction, GW established the following additional facts. GW is a class II rail carrier that operates over lines extending between Kansas City, Missouri and East St. Louis and Springfield, Illinois. It primarily operates as a line-haul carrier between Kansas City and St. Louis, Missouri. GE is GW's wholly-owned subsidiary and was formed for the purpose of acquiring and then operating over Conrail's East Alton line. At the north end of this twenty-two mile line is a small section of track that is subject to a paired track agreement dating back to 1906. GW and several other railroads are parties to that agreement, and when it purchased the East Alton line, GE succeeded to Conrail's interest in the paired track. GW also has acquired trackage rights from GE over a short segment (less than two miles) at the south end of the East Alton line. It is at this section of the line that GW intends to construct a new connecting track. When this track is completed, GW will have direct access to Conrail's Rose Lake Yard and will be capable of interchanging traffic with Conrail there. GW currently lacks that capability and therefore uses a switching carrier like GE to interchange traffic with Conrail.

Whereas GW is primarily a line-haul carrier, GE operates as a switching carrier, moving traffic between industries located on the East Alton line and Conrail's Rose Lake Yard interchange in East St. Louis. GW does not directly serve any of the industries located on the East Alton line. It thus does not participate in the East Alton–East St. Louis–Conrail interchange market.

According to GW, the employees of its new subsidiary are not currently unionized. GE crews operating over the East Alton line do not perform any service that was previously performed by GW crews under the GW–UTU collective bargaining agreement. The work performed by GE employees substitutes instead for that previously performed by Conrail employees. Thus, operations on the East Alton line have not deprived any UTU-represented employee of previously-performed work. Even over that section of the East Alton line subject to the paired track agreement, GE's operations have not affected those of GW. Moreover, once GW's connecting track at the south end of the line is completed, GW and GE will conduct distinct operations into Conrail's Rose Lake Yard.

As UTU alleges, Wertheim petitioned the ICC for an exemption under the Interstate Commerce Act's multi-carrier control provision, 49 U.S.C. § 11343. Because the ICC had not ruled on that petition when GE began operating in January 1994, all of GE's stock was placed in an independent voting trust, which vested control in an independent trustee in order to avoid a violation of the Act. While this appeal was pending, the ICC granted Wertheim's multi-carrier control petition and approved the transactions discussed above. *Gateway Eastern Railway Co.—Acquisition and Operation Exemption—Lines of Consolidated Rail Corp.*, slip op., 1995 WL 394470 (I.C.C. June 21, 1995). The ICC's decision permitted dissolution of the GE voting trust on July 27, 1995.

■ Based on the allegations in UTU's complaint and on the evidence submitted in connection with the motion to dismiss, the district court believed that the dispute alleged in the complaint was properly characterized as a representation dispute under section 2 Ninth of the RLA, 45 U.S.C. § 152 Ninth. Because such a dispute falls within the exclusive jurisdiction of the National Mediation Board, the district court dismissed

---

interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
\* \* \*
**Seventh. Change in pay, rules, or working conditions contrary to agreement or to section 156 forbidden**

No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title. 45 U.S.C. § 152 First & Seventh.

UTU's complaint for lack of subject matter jurisdiction. We review that dismissal de novo. *Ezekiel v. Michel,* 66 F.3d 894, 897 (7th Cir.1995); *Health Cost Controls v. Skinner,* 44 F.3d 535, 536 (7th Cir.1995).

## II.

■■■ The RLA defines three classes of labor disputes and provides different procedures for the resolution of each type of dispute. "Minor" disputes are those involving the application or interpretation of an existing collective bargaining agreement. *Elgin, Joliet & E. Ry. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945); *Association of Flight Attendants v. Republic Airlines, Inc.,* 797 F.2d 352, 357 n. 2 (7th Cir.1986); *see also Western Airlines, Inc. v. International Bhd. of Teamsters,* 480 U.S. 1301, 1302, 107 S.Ct. 1515, 1515, 94 L.Ed.2d 744 (1987) (O'Connor, Circuit Justice, granting stay). They are to be resolved under the Act through binding arbitration before a system board of adjustment. 45 U.S.C. § 184; *Republic Airlines,* 797 F.2d at 357 n. 2 (citing *International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. (Airline Div.) v. Texas Int'l Airlines, Inc.,* 717 F.2d 157, 158–59 (5th Cir.1983)). Although a federal court has no authority to interpret the terms of a collective bargaining agreement in order to resolve a minor dispute, the court may compel arbitration before the appropriate adjustment board and may enjoin the union from striking in the interim. *Western Airlines,* 480 U.S. at 302; *Burlington Northern R.R. Co. v. United Transp. Union,* 862 F.2d 1266, 1272 (7th Cir.1988).

■■■ "Major" disputes, by contrast, involve the formation of a collective bargaining agreement, and their resolution is governed by section 6 of the RLA, 45 U.S.C. § 156. *Burley,* 325 U.S. at 723, 65 S.Ct. at 1289–90; *Burlington Northern,* 862 F.2d at 1271; *International Bhd. of Teamsters,* 717 F.2d at 159. As we explained in *Burlington Northern:*

> [major] disputes are designed to be settled by the parties themselves through negotiation and mediation under the auspices of the National Mediation Board. If that fails, then the procedure allows for accep-

tance or rejection of binding arbitration as well as cooling-off periods. During this time, the status quo prevails.... The parties are not under compulsion to agree specifically, but, rather to exhaust all possibilities of conciliatory, negotiated agreement before resorting to self-help.

862 F.2d at 1272; see also *International Bhd. of Teamsters,* 717 F.2d at 159. When the dispute is a major one, a federal court is empowered to enforce certain RLA provisions, and it may enjoin disruption of the status quo until such time as the parties are authorized to engage in self-help. *Burlington Northern,* 862 F.2d at 1272; *International Bhd. of Teamsters,* 717 F.2d at 159.

■■■ Finally, "representation" disputes involve the composition of the collective bargaining unit and the identity of that unit's authorized representative for collective bargaining purposes. *Western Airlines,* 480 U.S. at 1302, 107 S.Ct. at 1515; *Republic Airlines,* 797 F.2d at 357 n. 2; *International Bhd. of Teamsters,* 717 F.2d at 158–59. Representation disputes are governed by section 2 Ninth of the RLA, 45 U.S.C. § 152 Ninth, and they fall within the NMB's exclusive jurisdiction. *Switchmen's Union of North Am. v. National Mediation Bd.,* 320 U.S. 297, 305–06, 64 S.Ct. 95, 99–100, 88 L.Ed. 61 (1943); *Air Line Employees Ass'n, Int'l v. Republic Airlines, Inc.,* 798 F.2d 967, 968–69 (7th Cir.) (per curiam), *cert. denied,* 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986); *Brotherhood of Locomotive Eng'rs v. Atchison, Topeka and Santa Fe Ry. Co.,* 768 F.2d 914, 919 (7th Cir.1985). Thus, once it is clear that a complaint alleges what is properly characterized as a representation dispute, the district court must dismiss the case for lack of subject matter jurisdiction, as Judge Stiehl did here. *See Air Line Pilots Ass'n, Int'l v. Texas Int'l Airlines, Inc.,* 656 F.2d 16, 23, 24 (2d Cir.1981). The court may not in that circumstance grant injunctive relief to maintain the status quo, "because to do so would necessarily have the effect, at least during the period of the injunction, of deciding the representation issue." *International Bhd. of Teamsters,* 717 F.2d at 161. Moreover, when the precise character of the dispute is in doubt (when the dispute, in other

words, is only "arguably" representational), a federal court should not proceed, for "the NMB has primary jurisdiction to determine whether it has exclusive jurisdiction over the dispute." *United Transp. Union v. United States,* 987 F.2d 784, 789 (D.C.Cir.1993); *see also International Ass'n of Machinists v. Northeast Airlines,* 536 F.2d 975, 977 (1st Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 328 (1976).

The district court, as we have said, believed that UTU's complaint alleged a representation dispute falling within the exclusive jurisdiction of the NMB. The union argued below and reiterates on appeal, however, that the dispute alleged is a "major" one, and that it therefore is entitled to an injunction prohibiting GW from unilaterally altering the crew consist requirement of the collective bargaining agreement pending mediation under section 6 of the RLA, 45 U.S.C. § 156. *See Burlington Northern,* 862 F.2d at 1272.

Considering similar factual circumstances in *Texas Int'l Airlines,* the Second Circuit found that neither a purely major nor a purely representational dispute had been presented, but that the circumstances there fell somewhere "in the hazy zone" between the two. 656 F.2d at 18–19.[4] The court thought it clear, for example, that a carrier could not disregard the provisions of an existing collective bargaining agreement in deciding to provide service over new routes. *Id.* at 19. Nor could the carrier transfer existing work to a newly-formed subsidiary for the purpose of displacing unionized employees without creating a major dispute under the Act. *Id.* Yet, it was not so clear that a carrier or its parent would create a major dispute, as opposed to a representation dispute, by forming "a separate and fully independent company" and hiring new employees to provide services over separate routes "neither flown by nor even certificated to the pre-existing carrier." *Id.* Indeed, the court believed that any attempt by a union to force recognition in that circumstance would raise a representation dispute within the NMB's exclusive jurisdiction. *Id.* The court found that when properly characterized, the allega-

tions in the union's complaint raised such a dispute:

[T]he complaint admits that TXI had not been flying the New York–Washington route, that the work of TXI pilots is not being terminated or curtailed, and that the activities of TXI are not being abandoned, but alleges that TXI is authorized to fly the new route and is using New York Air to do so. ALPA [the pilot's union] argues that in light of TXI's incestuous relationship with its sister company, all work of New York Air must be performed pursuant to the collective bargaining agreement and applicable seniority provisions. The question, according to ALPA, is not whether ALPA is to be designated the new representative of the New York Air pilots, but whether TXI may, through establishment of a company it controls, evade the obligations of its collective bargaining agreement with ALPA. This argument, of course, simply assumes that which the district court was unwilling to decide—that TXI and New York Air should be treated as a single carrier. Although the question is a close one, we agree with the district court that this issue is committed to the jurisdiction of the NMB.

*Id.* (emphasis omitted).

Although it adhered to the "spectrum" of possibilities discussed in *Texas Int'l Airlines,* the Ninth Circuit subsequently distinguished that decision in a case where the union had alleged that an airline and its corporate parent created a separate subsidiary to operate in the same marketplace with the intention of diverting the airline's existing business. *Air Line Pilots Ass'n, Int'l v. Transamerica Airlines, Inc.,* 817 F.2d 510, 515 (9th Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987). The subsidiary was created, according to the complaint, so that *Transamerica* and its parent could institute pay scales that had been rejected by the union in negotiations over a new collective bargaining agreement. *Id.* at 512. The Ninth Circuit found that the union's allegations did not raise a representation dispute because they fit within a category that *Texas*

---

4. The provisions of the RLA are applicable to the airline industry pursuant to 45 U.S.C. § 181.

*Int'l Airlines* deemed to be major—"where the carrier seeks to 'transfer existing business flown by ALPA pilots to a newly formed corporate alter ego for the purpose of displacing the work of ALPA pilots.'" *Id.* at 515 (quoting *Texas Int'l Airlines,* 656 F.2d at 19). The court therefore concluded that the union had alleged a major dispute over which the federal courts could exercise jurisdiction. *Id.*

Our own decision in *Burlington Northern,* 862 F.2d at 1276–77, distinguished the ultimate holding in *Texas Int'l Airlines* on the same ground. In that case, after efforts to negotiate a change in the crew consist provision of a collective bargaining agreement proved unsuccessful,[5] the railroad granted trackage rights covering approximately 1,860 miles of track to a wholly-owned subsidiary that had but five employees and that owned only an out-of-service bridge and 1.07 miles of track. Although the agreement authorized the subsidiary to use only three hub centers along the Burlington line, the agreement could be modified in the future to include other locations. *Id.* at 1269, 1276 n. 7. In concluding that these circumstances gave rise to a major rather than a minor dispute,[6] we characterized the railroad's actions as an attempt "to evade unilaterally the statutory and contractual rights" vested in the union. *Id.* at 1273; *see also id.* at 1274. The trackage rights agreement, we observed, could potentially result in "a huge diversion" of Burlington's existing business because the subsidiary would be using Burlington's equipment to conduct similar operations on Burlington's track. *Id.* at 1273, 1277. In so finding, we rejected the railroad's contention that the diverted business was "new": "[W]hen, as here, a carrier claims that the business it will be able to attract with lower prices obtained by evading Union costs is new, the business might be new but the work is not. It is work controlled by the labor agreements." *Id.* at 1276. For that reason, we distinguished *Texas Int'l Airlines* and

likened our case to *Transamerica,* noting that the carrier essentially would be diverting existing business to a wholly-owned subsidiary that would operate in the same marketplace. *Id.* at 1276–77.

The district court found the present case closer to *Texas Int'l Airlines* than to either *Transamerica* or *Burlington Northern.* It emphasized that GE would not be taking over GW business, but would be doing work previously performed by Conrail employees over a track primarily owned by Conrail. Thus, the new subsidiary would not be taking existing work from unionized employees to enable the parent to avoid its obligations under a collective bargaining agreement. We agree with the district court that both *Burlington Northern* and *Transamerica* are to be distinguished from the circumstances here.

As in *Texas Int'l Airlines,* it appears from the complaint and the evidence submitted in connection with the motion to dismiss that GW has formed a separate and independent subsidiary that will not divert existing business from its unionized employees. See 656 F.2d at 19. Although GW previously had the right to use a small segment of the East Alton line under the paired track agreement, it did not perform the switching operations along that line that GE presently performs. Those switching operations were performed by Conrail itself. As a line-haul carrier operating on a different track, GW lacked direct access to the industries located along the East Alton line, and it also did not have the capability to directly interchange traffic with Conrail at any East St. Louis location. This case, then, does not appear to present the situation that troubled the *Burlington Northern* and *Transamerica* courts, because GW's existing business is not being diverted to a subsidiary under its control, and the work of GW's unionized employees appears to be unaffected. Rather, the work performed by GE actually appears to be "new;" it is not simply work that the parent company was

---

5. The collective bargaining agreement required that crews be comprised of an engineer, a conductor, and one or two brakemen, but the railroad was seeking to implement a new and cheaper service utilizing only an engineer and a single brakeman. *Id.* at 1269.

6. The railroad did not argue that the dispute was representational under section 2 Ninth of the RLA, 45 U.S.C. § 152 Ninth.

able to obtain by evading its obligations under a collective bargaining agreement. *Cf. Burlington Northern,* 862 F.2d at 1276. In *Burlington Northern,* we recognized the possibility that a carrier could develop new business, "quite apart from that already performed by employees pursuant to a collective bargaining agreement," and transfer that new work to another corporation without running afoul of the existing agreement. *Id.* The factual scenario speculated about there appears to exist in the present case. Whether or not the GW–UTU collective bargaining agreement would also apply to GE's new operations in light of the relationship between those carriers raises a dispute over representation that is within the NMB's exclusive jurisdiction. The district court therefore properly dismissed UTU's complaint for lack of subject matter jurisdiction.

AFFIRMED.