Sharon Swarensky BILOW, Plaintiff,

v.

MUCH SHELIST FREED DENENBERG AMENT & EIGER, P.C.; Much Shelist Freed Denenberg & Ament, P.C.; Much Shelist Freed Denenberg Ament Bell & Rubenstein, P.C.; and Much Shelist Freed Denenberg Ament & Rubenstein, P.C., Defendants.

No. 98 C 7627.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 18, 1999.

Sharon Swarsensky Billow, Highland Park, IL, for Plaintiff.

Irving M. Geselewitz, Karen Kay Litscher, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Chicago, IL, Paul E. Lehner, Randall L. Mitchell, James Dominick Adducci, Marshall Lee Blankenship, Adducci, Dorf, Lehner, Mitchell, & Blankenship, P.C., Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Sharon Swarensky Bilow, an attorney representing herself, sues her former employer, the law firm of Much Shelist Freed Denenberg Ament & Eiger, P.C. ("the Firm"), alleging various claims under ERISA, 29 U.S.C. § 1001 *et seq.*, and Title VII, 42 U.S.C. § 2000e *et seq.* She also presents several pendant state law claims for relief. At base, Bilow contends that the Firm owes her money for employee benefits it wrongfully denied to her, and that it fired her because she is a woman or in retaliation for her various complaints about the Firm. The Firm has filed a motion to dismiss arguing, essentially, that Bilow has pled herself out of court.[1] In many respects, we agree: Bilow's complaint fails to state a claim under ERISA, and shows that she is not entitled to relief for sex discrimination in the administration of employee benefits or retaliation for complaining about discrimination in that context. On the other hand, Bilow has adequately alleged a cause of action for sex discrimination in working conditions and retaliation for complaining about those conditions. Therefore, we grant in part and deny in part the Firm's motion to dismiss.

### FACTS

Because the case is before us on a motion to dismiss, we assume the truth of Bilow's allegations and base our recital of the facts on those contained in her complaint. (R. 12, Second Am.Compl.) However, we relate only those facts pertinent to Bilow's federal actions and omit any reference to the tangle of extraneous facts contained in the complaint.

In 1982, Bilow went to work at the Firm as an associate. Three years later, the Firm promoted her to income partner; Bilow was the first female to hold that position. At that time, the Firm provided health insurance for its employees and their families. In 1989, the Firm stopped paying the cost of health insurance for the dependents of employees, but gave partners who had premiums deducted from their paychecks an annual increase.[2] In other words, the Firm continued paying premiums directly to the insurance provider for its employees, but required employees to pay for dependent care coverage; then, if the employee was a partner, the Firm would "gross up" the partners' pay check from its general fund. This policy applied to Bilow because she purchased health insurance coverage for her husband and children.

In 1992, while Bilow was on maternity leave, the Firm again changed its policy

---

1. Bilow's original complaint, (R. 1), was 26 pages long and had 132 complex paragraphs. We sua sponte dismissed the original complaint and instructed Bilow to comply with Federal Rule of Civil Procedure 8(a). (R. 3, Order of Feb. 26, 1999.) In response, Bilow submitted her first amended complaint, (R. 6), which was 48 pages long, had 216 complex paragraphs, and 27 exhibits. Again, we dismissed the complaint as severely overpled and instructed Bilow to remedy the problem. (R. 7, Order of Mar. 24, 1999.) Her most recent complaint, (R. 12, Second Am.Compl.), simply compounds the problem: it is 52 pages long, has 223 paragraphs, and has 34 exhibits.

2. The record does not disclose whether the salary increase (or "gross-up," as Bilow refers to it) corresponded to the amount of the premium deducted from employees' paychecks. Exhibit 4 to Bilow's response to the Firm's dismissal motion suggests that the Firm was not technically "reimbursing" employees for deducted premium: in each fiscal year since 1993, equity partners who purchased dependent health coverage received a salary adjustment of $5,300, and income partners received $4,600. But Exhibit P to the complaint demonstrates that the Firm deducted $5,118.14 from Bilow's 1997 paychecks for medical insurance.

regarding health care coverage for employees' dependents. The Firm announced that it would provide the gross-up only for those partners whose dependents did not have independent sources of medical insurance. According to the complaint, the Firm never informed Bilow of the change, but stopped giving her the salary adjustment for the dependant health care premiums it continued to deduct from her paychecks. Bilow did not notice that she was not receiving the gross-up until March 1998.

She immediately informed Anthony Valiulis, an equity partner, of the problem. He in turn referred her complaint to Steven Schwartz, an equity partner who was on the Firm's management committee. Schwartz responded that the Firm no longer reimbursed dependant coverage when the dependent could obtain health insurance from an independent source.

Valiulis forwarded Schwartz's response to Bilow, who, according to the complaint, did nothing for six weeks. (*See* Second Am.Compl. at ¶ 36 ("Plaintiff waited patiently for approximately six weeks for defendant [sic] to remedy the deficiency in plaintiff's [sic] compensation or, at a minimum, to discuss the matter with plaintiff [sic].").) Then, on April 29, she sent a memorandum to the Firm's management committee:

> It has been approximately six weeks since the firm has acknowledged that my salary has never been "grossed up" for the medical insurance deducted from my salary. Given the criminal liability attached to this failure to pay, which dates back to 1986 and continues to the present, I do not understand the firm's apparent nonchalance. No one has even discussed the status of the matter with me.
>
> Please let me know when I can expect to receive an accounting.

(Second Am.Compl.Ex. H.) The management committee responded to Bilow's memo on May 18 with a memo of it own. (Second Am.Compl.Ex. I.) The Firm stated that Bilow's gross-up had been paid in full through 1992, and that she had received a $2,000 gross-up in 1993 (while the automatic gross-up was being phased out), but that she had not received any further gross-ups because "we assumed you were among those partners whose spouses had dependent coverage." The memo concluded: "Please advise for the period 1993 to date whether or not your spouse had dependent coverage at his place of employment."

On May 18, Bilow met with Michael Shelist, an equity partner and head of the management committee. She told him that her husband did not receive health insurance from his employer, and that all along she had had health insurance premiums for her dependents deducted from her paychecks. Shelist asked Bilow to reduce to writing her contention and to provide information regarding any other health insurance coverage, even if not provided by Bilow's husband's employer. Although Bilow complained that Shelist had no right to make such a demand, she complied with his request on May 27. (Second Am. Compl.Ex. J.)

Meanwhile, on the work front, Bilow's primary responsibility was a large class action lawsuit from which the Firm expected to earn a substantial contingency fee. In fact, Bilow claims that for the six years proceeding her termination, she "had been working almost full-time on the $57 million contingent fee class action." [3] (Second Am.Compl. at ¶ 49.) The case, *Brouwer v. Rochwarger,* arose out of "one of the largest, if not the largest bankruptcy [sic] ever filed in Indianapolis," (Second Am.Compl. at ¶ 97), involved "hundreds of thousands of documents," (*id.* at ¶ 98), and required the class to prove a complex RICO conspiracy, (*id.*). The *Brouwer* defendants hired Ernst & Young, which assigned four

---

**3.** The complaint is unclear whether the Firm expected to earn $57 million in contingency fees for the class action, or whether it evaluated the case at $57 million and expected some portion of the award for fees.

lawyers to try the case and hired several expert witnesses. Bilow, on the other hand, was required to try the case "essentially single-handedly," (*id.* at ¶ 102), in Indianapolis with local counsel, who allegedly "was incapable of providing significant assistance," (*id.*).

On March 10, 1998, Bilow met with Shelist and Michael Hyman, another member of the Firm's management committee. She voiced concerns about her ability to try "an extremely complex class action involving civil RICO, technical accounting issues and various issues of bankruptcy law." (*Id.* at ¶ 74.) She told Shelist and Hyman about the quality of her opponents and requested the help of Christopher Stuart, an income partner who earlier had done significant work on the case. (*Id.* at ¶¶ 75–78.) Additionally, Bilow informed them that she would not be able to spend each night of the anticipated month-long trial in Indianapolis because her husband worked nights and she did not have alternate child care arrangements. (*Id.* at ¶¶ 80, 84.) Shelist and Hyman, however, refused to assign anyone else to help her litigate the case, (*id.* at ¶¶ 79, 86); she "told them that what they were asking of her was impossible and that even were they to fire her, she could not [do it]," (*id.* at ¶ 86).

Bilow maintains that no male partner, income or equity, was ever required to litigate such a complex and lucrative case alone. (Second Am.Compl. at ¶¶ 104–15.) Additionally, she alleges that male partners often received "large amounts of staff on short notice," (*id.* at ¶ 112), and that female attorneys were regularly required to litigate cases with which they had no prior involvement, (*id.* at ¶¶ 109, 110).

Immediately after the March 10 meeting, the Firm conducted a survey of its partners. Bilow completed the survey on March 20. (Second Am.Compl.Ex. AA.) In response to a request to list her "three most significant concerns about the firm," Bilow first complained about her compensation and then "[t]hat there is a ruling class at the firm and a ruled class and all the women in the firm are in the ruled class." (*Id.* Ex. AA, Survey, question # 6.) (She did not report a third concern.) The surveys were not anonymous.

On June 1, 1998—about two months after Bilow completed the survey, and only three days after her most recent run-in with Shelist over the gross-up—Shelist and David Brown, an equity partner on the management committee, informed Bilow that her employment would be terminated. (Second Am.Compl. at ¶¶ 48–49.) They told her that the Firm "did not have enough work to keep all of its senior litigators busy," (*id.* at ¶ 123), even though, Bilow alleges, the Firm had plenty of litigation work, (*id.* at ¶¶ 50–52).

On November 20, 1998, Bilow filed a discrimination charge with the EEOC. In her EEOC charge, Bilow claimed that "[the Firm] took away [her] health insurance salary gross up as a result of sex discrimination," (EEOC Charge ¶ 6); "[the Firm's] real reason for terminating [her] was to retaliate for [her] claim for the health insurance gross up," (*id.* at ¶ 12); and "[the Firm] discriminated against [her] by requiring her to try an extremely complex $57 million class action [essentially alone]. . . . [And, w]hen [Bilow] objected, [the Firm] terminated her in retaliation," (*id.* at ¶ 14).

In her second amended complaint, Bilow presents ten enumerated claims for relief, four of which rely on state law. We focus exclusively on Bilow's federal claims. In counts I and II, Bilow charges that the Firm violated ERISA by not providing her with a summary plan description, (Second Am.Compl. at ¶ 149), failing to notify her of a material change in her benefits, (*id.* at ¶ 150), withholding benefits to which she was entitled under the gross-up plan, (*id.* at ¶ 153), and firing her in retaliation for her complaints regarding the gross up, (*id.* at ¶ 168). The remainder of her federal claims arise under Title VII: the Firm assumed, because she is a woman, that her husband's employer provided health insurance and did not make similar assumptions

about male employees' spouses' employers, (*id.* at ¶ 204); the Firm required her to litigate the class action alone, and made no such requirements of its male partners, (*id.* at ¶ 207); the Firm fired her in retaliation for her complaints regarding the gross up, (*id.* at ¶ 212); and the Firm fired her in retaliation for her complaints about trying the class action alone, (*id.* at ¶ 219).

The Firm now argues that we must dismiss Bilow's federal claims under Federal Rules 12(b)(1) and 12(b)(6), and should decline to exercise our discretion to hear her state law claims. The Firm contends that Bilow cannot state a claim under ERISA because the gross-up for dependent insurance premiums was not an "employee welfare benefit plan" as that phrase is used in the statute. For the same reason, according to the Firm, we lack subject matter jurisdiction over Bilow's ERISA claim. As to the Title VII claims, the Firm argues that Bilow's complaint regarding discriminatory denial of the gross-up is untimely; she has not alleged facts establishing an adverse employment action with respect to her class action claim; and she has not alleged any protected activity and therefore cannot recover under either theory of retaliation.

### STANDARD OF REVIEW

Dismissal on the pleadings is improper unless a plaintiff can prove no facts consistent with those in her complaint that entitle her to relief. The standard is exceedingly difficult for a defendant, particularly a Title VII defendant, to meet. In fact, had Bilow heeded our recommendation—made twice—to conform her pleadings to Federal Rule 8(a), in all probability the Firm's motion would not have been brought and, if it had, easily denied. Instead, Bilow has flooded the Court with allegations (both relevant and irrelevant) and documents, thereby confusing not only the substantive question of whether she has pled herself out of court, but also whether the motion would more properly

be considered one for summary judgment due to all the "evidence" Bilow has submitted.[4] In other words, Bilow has wasted our time, the defendants' time, and defense counsel's time: we admonish her to refrain from this litigation strategy in the future.

In any event, we need not transform the Firm's motion into one for summary judgment. It is well-established that documents either attached to, or referred to in, a complaint may be considered on a Rule 12(b)(6) motion to dismiss for failure to state a claim. *International Marketing, Ltd. v. Archer–Daniels–Midland Co., Inc.,* 192 F.3d 724, 728–29 (7th Cir.1999); *Duferco Steel Inc. v. M/V Kalisti,* 121 F.3d 321, 324 n. 3 (7th Cir.1997). Furthermore, when considering a motion to dismiss for lack of subject matter jurisdiction, we may entertain evidentiary materials addressed to the jurisdictional question. *United Transp. Union v. Gateway Western Ry. Co.,* 78 F.3d 1208, 1210 (7th Cir.1996); *Capitol Leasing Co. v. F.D.I.C.,* 999 F.2d 188, 191 (7th Cir.1993). Keeping in mind these standards, we now turn to the question of whether Bilow has adequately alleged a federal cause of action.

### ANALYSIS

#### I. Bilow's ERISA Claims

Bilow complains that the Firm committed two types of ERISA violations: first, that the Firm mismanaged its employee welfare plan by failing to implement procedures required by ERISA (e.g., providing notice of changes to the plan) and withholding benefits to which she was entitled ("mismanagement claims"), 29 U.S.C. § 1132(a); and, second, that the Firm fired her in retaliation for her complaints regarding its management of the welfare plan, 29 U.S.C. § 1140.

The Firm responds that the gross-up program is not an employee welfare benefit plan protected by ERISA; instead, according to the Firm, the gross-up payments are merely salary adjustments paid

---

4. We refer to the 34 exhibits attached to Bilow's second amended complaint, as well as the four exhibits attached to her response brief.

to qualifying partners from the Firm's general assets. Thus, we must first determine whether this gross-up program constitutes a plan protected by ERISA. We conclude it is not, and for this reason dismiss Bilow's mismanagement claims. We also dismiss Bilow's ERISA retaliation claim.

### A. The Firm's Gross–Up Program is Not an ERISA Plan

As many courts have commented, ERISA does not clearly define what constitutes an "employee welfare benefit plan." *See, e.g., Massachusetts v. Morash,* 490 U.S. 107, 113, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) ("The precise coverage of ERISA is not clearly set forth in the Act."). Instead, the statute defines the phrase by reference to itself: "The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund or program ... established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits." 29 U.S.C. § 1002(1)(A). The statute does not define "plan, fund, or program."

Fortunately, valuable guidance has been provided by courts that have previously struggled with the issue. Initially, we know that "[t]here are no particular formalities that a plan must comply with to be an ERISA welfare plan," *Miller v. Taylor Insulation Co.,* 39 F.3d 755, 760 (7th Cir.1994); for example, "it need not be in writing to be covered," *Diak v. Dwyer, Costello & Knox, P.C.,* 33 F.3d 809, 811 (7th Cir.1994), and, in fact, "it need not be funded," *Miller,* 39 F.3d at 760. To determine the existence of an ERISA-governed plan, a court must evaluate "whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Diak,* 33 F.3d at 812 (quotation omitted).

Nevertheless, "an employee benefit program not funded through a separate fund is not an ERISA plan." *California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.,* 519 U.S. 316, 326, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997); *see also id.* ("The existence of [a] fund triggers ERISA."); *Morash,* 490 U.S. at 116, 109 S.Ct. 1668 ("It is unlikely that Congress intended to subject to ERISA ... benefits which by their nature are payable on a regular basis from the general assets of the employer."). By way of explanation, the Supreme Court stated: "Benefits paid out of an employer's general assets present[ ] risks indistinguishable from 'the danger of defeated expectations of wages for services performed,' a hazard with which ERISA is unconcerned." *Dillingham,* 519 U.S. at 327, 117 S.Ct. 832 (quoting *Morash,* 490 U.S. at 115, 109 S.Ct. 1668). In other words, the primary concern of ERISA is "the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds," not salary disputes. *Morash,* 490 U.S. at 115, 109 S.Ct. 1668.

The Firm does not dispute that its health insurance plan—by which it means purchasing insurance for employees, withholding premiums for those employees who want additional coverage, and forwarding those premiums to the insurer—is governed by ERISA. Instead it argues that the gross-up program is an informal and discretionary payroll practice that is not referred to in any of the Firm's health insurance literature or employee handbooks. Essentially, the Firm contends that the gross-up program is separate from its employee welfare plan, and that Bilow cannot bootstrap her payroll dispute onto the health care plan to create jurisdiction under ERISA. We agree.

In reaching this conclusion we do not rely exclusively on the fact that the salary adjustments were paid from the Firm's general assets;[5] the Seventh Circuit has made clear this factor is not determinative.

---

5. In fact, we assume (because we have not

been told otherwise) that the Firm pays to

*See, e.g., Diak,* 33 F.3d at 813 ("[P]ayment of benefits out of general funds satisfies the requirement of an ascertainable source of funding."); *see also Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 18, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) ("[I]f an employer has an administrative scheme for paying benefits, it should not be able to evade the requirements of the statute merely by paying those benefits out of general assets."). Rather, we believe the gross-up program is more like *Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (a promise to pay employees for unused vacation time from general assets is not an ERISA plan, even though ERISA governs vacation benefits), than *Brundage–Peterson v. Compcare Health Services Ins.,* 877 F.2d 509 (7th Cir.1989) (ERISA governs a plan whereby the employer pays employees' health insurance and remits premiums withheld from salary for dependent coverage).

The Firm's gross-up program is part of its compensation plan for partners. The salary adjustment, although dependent on a partner's utilization of the Firm's health insurance program for dependents, is not integral to, and in no way impacts, the provision of that insurance. Whether the Firm paid the gross-up or not, Bilow and her family were insured. And that is what Congress intended to accomplish via ERISA; ERISA is unconcerned with the accuracy of Bilow's paycheck.

. Because the Firm's gross-up program is not governed by ERISA, Bilow has not stated a claim for relief under 29 U.S.C. § 1132(a).

## B. ERISA Retaliation

Bilow claims that the Firm fired her in retaliation for her complaints regarding

the gross-up program. The Firm does not present a separate argument for dismissal of this claim, apparently assuming that the lack of an ERISA-governed plan precludes a retaliation claim.

We refuse to apply the same assumption. Many of the standards applied in ERISA retaliation cases are borrowed from Title VII cases. *See, e.g., Fairchild v. Forma Scientific, Inc.,* 147 F.3d 567, 576 (7th Cir.1998) (setting forth direct evidence and *McDonald Douglass* burden-shifting methods of proof in an ERISA retaliation case); *Grottkau v. Sky Climber, Inc.,* 79 F.3d 70, 72–73 (7th Cir.1996) (same, relying on Supreme Court cases resolving issues under Title VII). And, in the Title VII context, a plaintiff can state a claim for retaliation even if the underlying discrimination complaint is meritless. *See, e.g., Sweeney v. West,* 149 F.3d 550, 554 (7th Cir.1998) (Title VII protects employees from retaliation for reasonable, good-faith complaints of discrimination); *Dey v. Colt Const. & Development Co.,* 28 F.3d 1446, 1457–58 (7th Cir.1994) (same). Further, the purpose of Title VII's retaliation provisions—protecting employees' good-faith attempts to enforce Title VII "without the added burden of having to be right," *Sweeney,* 149 F.3d at 554—could equally apply to the ERISA retaliation provision. Although we have not found any cases discussing this particular Title VII doctrine in the ERISA context (and we ultimately conclude it does not apply), a reasonable argument could be made that an ERISA retaliation plaintiff may be able to state a claim even though the underlying ERISA claim is unavailing.[6] Thus, the Firm's assumption is unwarranted.

insure its employees from its general funds as well.

**6.** In *Cvelbar v. CBI Ill., Inc.,* 106 F.3d 1368, 1373 (7th Cir.1997), the Seventh Circuit may have foreclosed this argument: "The existence of an 'ERISA-governed plan' is an essential precursor to federal jurisdiction." *Cvelbar,* however, analyzes a claim brought

under 29 U.S.C. § 1132(a) (entitlement to benefits); obviously, a plaintiff cannot be entitled to benefits under ERISA in the absence of an ERISA plan. Here, however, we are analyzing a retaliation claim brought under § 1140, and, for the reasons stated in the text, believe the issue is murkier than that presented in *Cvelbar.*

Nevertheless, after thoroughly reviewing the case law, we conclude that the absence of an ERISA-governed welfare plan necessarily forecloses an ERISA retaliation claim. *Cf. Hite v. Biomet, Inc.,* 38 F.Supp.2d 720, 730 (N.D.Ind.1999) ("Biomet's short term disability plan is a payroll practice and not an employee benefit plan.... For this reason, the plan is not subject to ERISA's requirements and Hite cannot maintain a § 510 [codified at 29 U.S.C. § 1140] claim."). First, unlike a Title VII retaliation plaintiff, "a plaintiff in an ERISA [retaliation] action must demonstrate that the employer had the 'specific intent' to violate the statute." *Little v. Cox's Supermarkets,* 71 F.3d 637, 642 n. 3 (7th Cir.1995) (citing 29 U.S.C. § 1140); *see also Lindemann v. Mobil Oil Corp.,* 940 F.Supp. 189, 193 (N.D.Ill.1996) ("To prove a § 510 violation, a plaintiff must show that the defendant terminated her with the specific intent of retaliating for, or preventing, her use of benefits."). Logically, Bilow cannot possibly prove (or reasonably allege) the Firm's specific intent to violate ERISA in the absence of an ERISA-governed plan.

Similarly, Bilow cannot reasonably allege that she is a member of a class protected by ERISA, as required to state a prima facie case of retaliation.[7] *See Little,* 71 F.3d at 642 ("[T]o establish a prima facie case [of retaliation under ERISA], a plaintiff must show she (1) belongs to the protected class."). ERISA protects only employees who are participants and beneficiaries of ERISA-governed plans. 29 U.S.C. § 1140 ("It shall be unlawful for any person to discharge ... a participant or beneficiary for exercising any right ... under the provisions of an employee benefit plan."). Title VII, on the other hand, protects "any individual" who acts under that statute. 42 U.S.C. § 2000e–3. Because there is no plan, Bilow cannot be a participant or beneficiary and, thus, cannot state an ERISA retaliation claim.

For these reasons, we dismiss all of Bilow's claims purportedly arising under ERISA.

## II. Bilow's Title VII Claims

Bilow's Title VII claims also fall into two basic categories: those related to the gross-up program, and those related to the Firm's decision not to assign additional attorneys to the class action. We address each separately.

### A. Discrimination and Retaliation in the Gross-up Program

Bilow alleges that the Firm discriminated against her by assuming, because she is a woman, that her husband had health insurance from an independent source and not making a similar assumption for male partners, in violation of 42 U.S.C. § 2000e–2(a). Additionally, she claims the Firm fired her in retaliation for complaining about the gross-up discrimination, in violation of 42 U.S.C. § 2000e–3(a). The Firm seeks dismissal of these claims on the ground that Bilow's EEOC charge was untimely and, in the context of the gross-up program, Bilow did not engage in any activity protected by Title VII.

#### 1. Bilow's EEOC Charge of Discrimination in the Gross-up was Untimely

In Illinois, a Title VII plaintiff must file a charge with the EEOC within 300 days of the discrimination. *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 707 (7th Cir.1995). Here, the alleged discrimination (the Firm's purportedly sexist assumption) took place no later than 1993, when the Firm began phasing-out Bilow's gross-up payment, but Bilow did not file her EEOC charge until November 1998. Thus, her EEOC charge complaining about the discriminatory assumption was untimely.

Bilow attempts to avoid this conclusion by arguing that she did not know, and

---

7. Bilow does not attempt to set forth a direct claim of ERISA retaliation.

could not reasonably have discovered, the factual predicate for her claim. We believe, although Bilow is not explicit, that she urges equitable tolling of the limitations period. This argument borders on ridiculous. We believe, as we must, that Bilow did not actually discover the Firm's non-payment of the gross-up until March 1998. However, the law requires reasonable diligence on the part of a plaintiff seeking such relief. *See, e.g., Chakonas v. City of Chicago,* 42 F.3d 1132, 1135 (7th Cir.1994) ("Equitable tolling is appropriate when the plaintiff, despite all due diligence, is unable to obtain vital information bearing on the existence of her claim."). A reasonable person in Bilow's position exercising appropriate diligence would have discovered long ago that each year she was not receiving $4,600 to which she was entitled and why.

Similarly, Bilow argues—again, not explicitly—that the Firm should be estopped from asserting a timeliness defense because it affirmatively represented that she was receiving the gross-up. Bilow relies on a compensation summary given to her by the Firm, which stated "base salary (without insurance adjustment)," to justify estoppel. (Second Am.Compl. at ¶ 30, citing Ex. F.) The compensation form does not contain any other information about insurance, and Bilow does not allege any other affirmative representations by the Firm regarding the gross-up.

 Equitable estoppel "comes into play when a defendant takes active steps to prevent a plaintiff from suing on time." *Chakonas,* 42 F.3d at 1136. As a matter of law, the compensation summary does not constitute a representation by the Firm to Bilow that it was paying her an insurance adjustment, or even that she was entitled to one. Instead, the compensation summary (a form letter, by the way) simply reports the partners' base salary with the caveat that "base salary" does not include any insurance adjustment that may or may not be warranted. No reasonable person could read the compensation summary as a statement that the recipient was receiving an insurance adjustment. Because Bilow has not adequately alleged any active steps by the Firm that impeded her ability to discover its allegedly discriminatory assumption, equitable estoppel is not available to her.

 Finally, Bilow contends that the Firm's allegedly discriminatory assumption carried over into the limitations period because that assumption was the basis for denying her the annual gross-up, which in turn occurred during the appropriate period. However, the "lingering effect of an unlawful act is not itself an unlawful act, so it does not revive an already time-barred illegality." *Dasgupta v. University of Wis. Bd. of Regents,* 121 F.3d 1138, 1140 (7th Cir.1997); *see also id.* ("[A]n untimely Title VII suit cannot be revived by pointing to effects within the limitation period of unlawful acts that occurred earlier.") (citing *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)); *cf. Leavell v. Kieffer,* 189 F.3d 492, 494–95 (7th Cir.1999) ("A person fired from his job effective in six months is injured (and the clock starts to run) on the date of the discharge, not six months later when the employment ends."). Here, the allegedly unlawful act of assuming that Bilow's husband had an independent source of health insurance occurred in 1993; the Firm's annual failure to pay Bilow the gross-up was a "lingering effect" of that assumption, not an independent discriminatory act. Thus, Bilow cannot rely on a continuing violation theory to escape the limitations period.

In sum, Bilow's EEOC charge that the Firm discriminated against her by assuming her husband had independent insurance is untimely. Furthermore, she has not alleged any facts justifying or excusing her delay in filing the charge. Therefore, we grant the Firm's motion to dismiss this claim.

## 2. Bilow Did Not Engage in Activities Protected by Title VII

It is axiomatic that a Title VII retaliation plaintiff must allege that she engaged in activities or expression protected by Title VII. *See, e.g., Payne v. Milwaukeè County*, 146 ·F.3d 430, 434 (7th Cir.1998); *Ashkin v. Time Warner Cable Corp.*, 52 F.3d 140, 143 (7th Cir.1995). In the context of the gross-up program, Bilow has not met her burden. She does not allege that she ever complained tò the Firm that it was administering the gross-up program in a sexually discriminatory manner. Throughout her complaint she asserts the underlying discrimination (which we have already concluded is time-barred), but never that she confronted the Firm about this. allegedly discriminatory practice. Lacking an allegation of protected activity, she cannot possibly state a claim that the Firm retaliated for it. Thus, we grant the Firm's motion to dismiss this claim.

## B. Discrimination and Retaliation in Bilow's Working Conditions

Bilow's final Title VII claims are that the Firm discriminated against her in her working conditions by requiring her, because of her sex, to litigate a complex, document-heavy class action without support, when it never required the same of male partners; and that the Firm retaliated against her when, in the partner survey, she complained about sex discrimination at the Firm.

The Firm characterizes its decision not to assign other attorneys to the class action as a "business decision" that cannot constitute an adverse employment action. Although the Firm may have had any number of legitimate reasons for its decision, the caselaw clearly establishes that depriving a person of adequate support services, *see, e.g., Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996), can constitute an adverse employment action. "The

question whether a change in an employee's job or working conditions is material adverse, rather than essentially neutral, is one of fact," *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 273 (7th Cir.1996), and thus inappropriate for decision on a motion to dismiss. At this stage of the case, we must assume Bilow was treated differently than male partners by being subjected to significantly harsher working conditions because she was a woman.[8] Because Bilow has adequately pleaded discrimination in working conditions, we deny the Firm's motion to dismiss this claim.

Similarly, we must deny the Firm's motion to dismiss Bilow's allegation that the Firm fired her in retaliation for her complaint of differential treatment. Approximately one week after the Firm rejected Bilow's plea for help with the class action lawsuit, she complained via the partner survey that, essentially, female partners had no voice in management decisions at the Firm. Two months later the Firm fired her, she says, in retaliation for her complaint of discrimination. Bilow has adequately alleged that she engaged in a protected activity and suffered an adverse employment action because of that activity. That is enough to save her claim from dismissal.

Although we agree with the Firm's contention that Bilow's complaint was vague, it was not so vague as to justify dismissal on the pleadings. Unlike those cases in which courts have held that plaintiffs' complaints were not protected, here Bilow explicitly complained about the gender makeup of the Firm's power structure and implicitly complained that it was discriminatory. *Compare Zinn v. McKune*, 143 F.3d 1353, 1363 (10th Cir.1998) ("She reported incidents of 'harassment' ... but did not complain that the harassment was sexual or otherwise discriminatory."); *Barber v. CSX Distribution Services*, 68 F.3d 694, 701 (3rd Cir.1995) ("Barber's letter ...

---

**8.** Obviously, we do not decide these issues; nor do we know whether Bilow can prove these facts.

complains about unfair treatment in general ... but it does not specifically complain about age discrimination."); *Ashkin,* 52 F.3d at 143 ("Ashkin had not in fact complained about any sexual harassment[;] her expressed objections ... were limited to his managerial style."). Whether the Firm actually understood Bilow's survey as complaining about discrimination and whether her complaint informed its decision to fire her are questions of fact to be resolved during later stages of the case. Therefore, we also deny the Firm's motion to dismiss this claim.

## CONCLUSION

While the scope of Ms. Bilow's lawsuit has been significantly reduced, it is evident from this opinion that this case will continue through the discovery phase and possibly to trial.

The Firm's motion to dismiss Ms. Bilow's second amended complaint, (R. 16–1), is partially granted and partially denied as indicated herein. All discovery in this case must be concluded by December 31, 1999. Any dispositive motions will be due on or before January 28, 2000.